**Avril M. DAY, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, and Leonard Herman, Director of the Ohio Bureau of Disability Determination, Defendants.**

No. C–1–87–800.

United States District Court, S.D. Ohio, W.D.

Nov. 22, 1991.

Order of Clarification
July 31, 1992.

Nancy Lee Brock, Legal Aid Society of Cincinnati, Cincinnati, Ohio, for plaintiffs.

Rita Sue Eppler, Ohio Atty. Gen., Columbus, Ohio, Nicholas John Pantel, Dept. of Justice, Cincinnati, Ohio, Neal Dittersdorf, U.S. Dept. of Justice, Civ. Div., Karen Stewart, U.S. Dept. of Justice, Asst. Atty. General's Office, Washington, D.C., for defendants.

ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SPIEGEL, District Judge.

This matter is before the Court on the plaintiffs' motion for summary judgment (doc. 84), their summary brief (doc. 85), the defendants' motion for summary judgment (doc. 88), the plaintiffs' opposition to the defendants' motion for summary judgment (doc. 94), their summary brief (doc. 95), the defendants' reply (doc. 104), the plaintiffs' motion to file an instanter supplemental memorandum (doc. 105), the defendants'

reply (doc. 107), and the defendants' corrected reply (doc. 109). We hereby grant the plaintiffs' motion to file an instanter supplemental memorandum, and will consider that memorandum in this decision.

## INTRODUCTION

Congress has authorized the Secretary of Health and Human Services ("HHS") to administer the distribution of disability benefits through the Social Security Administration ("SSA") under Titles II and XVI of the Social Security Act ("the Act").

The over-arching issue in the case before the Court is whether HHS and the Ohio Bureau of Disability Determinations ("BDD") have complied with the Act and the accompanying regulations. This case is "not a challenge to the [validity of the] regulations, but rather to the practices of the BDD...." Brief for Plaintiffs, doc. 105, at 1, 2.

In the case before the Court, the plaintiffs allege that the Secretary of HHS and Leonard Herman, the Director of the BDD have not complied with the Act and its regulations for developing and evaluating medical evidence.[1] Amended Complaint, Class Action, at 2.

## STATUTORY FRAMEWORK FOR DETERMINING SOCIAL SECURITY BENEFITS

The Secretary of HHS has designated state agencies to determine who is disabled. A person who is deemed disabled may receive social security disability benefits. Specifically, the Secretary has designated the BDD, to make disability determinations in Ohio. See 42 U.S.C. § 421(a)(2) (1991); 20 C.F.R. §§ 404.1503, 1601 et seq (1991); Heckler v. Day, 467 U.S. 104, 106 n.

4, 104 S.Ct. 2249, 2251 n. 4, 81 L.Ed.2d 88 (1984).

A person must make a claim for social security benefits when he has become disabled. He must demonstrate an "inability to engage in any substantial gainful activity by reason of medically determinable physical or mental impairment which can be expected to result in death or ... be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. §§ 416(i)(1), 1382(c)(3)(a).[2] The statute further provides that the individual's impairments must be so severe that he cannot engage in any other kind of substantial gainful work given his background and experiences. 42 U.S.C. § 423(d)(2)(A). The claimant's impairment must be shown by "... medically acceptable clinical or laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The regulations promulgated under the Act establish successive levels of review. In Ohio, the BDD makes the disability determination on the claimant's initial application for benefits. If a claimant is not satisfied with the BDD's initial decision, the claimant may ask the BDD to reconsider it. 20 C.F.R. § 404.1503. Administrative law judges ("ALJ's") hear the appeals of the reconsideration decisions. The Secretary's Appeals Council considers the appeals of the ALJ's decisions. 20 C.F.R. § 902–983. The decisions of the Secretary's Appeals Council can be appealed to the federal courts. The case now before this Court is concerned with the policies and practices of the BDD at the initial and reconsideration levels.[3]

At each level of review, a claimant's application for disability benefits is evaluated according to a five step analysis.[4]

1. In particular, the plaintiffs' action is addressed to four disability benefit programs: Disability Insurance Benefits, 42 U.S.C. § 423(a); Widow's, Widower's and Surviving Divorced Spouse Insurance Benefits ("Widow's benefits"), 42 U.S.C. § 402(e-f); Child's Insurance Benefits, 42 U.S.C. § 402(d); and Supplemental Security Income, 42 U.S.C. § 1382(a). Brief for Plaintiff, doc. 84, at 8.

2. This statutory definition is not used for determining Widow's benefits and the Supplemental Social Security Income for disabled children.

3. Ultimately, however, the Secretaries of HHS and the BDD are jointly responsible for the actions and decisions of the BDD.

4. Because this action centers on the actions of the BDD at the initial and reconsideration levels, this Court considers the five step review

When a determination of entitlement to disability benefits is made under one of the steps, an evaluation under subsequent steps is unnecessary. 20 C.F.R. §§ 404.-1520(a)–(f); *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). In the first step, the BDD must determine whether the claimant is currently working at a level of substantial gainful activity. If so, benefits are denied. If not, in the second step the BDD determines whether the claimant has a severe impairment or combination of impairments that are severe. A severe impairment is a condition that significantly limits the claimant's ability to do basic work activities. If the BDD determines that a severe impairment does not exist, then the BDD denies benefits.

In the third step, the BDD considers whether the claimant's impairment is sufficient under listed impairments in Appendix One. 20 C.F.R. §§ 404.1520(d), 416.920(d). If it is, then entitlement to disability benefits is automatic. If not, the claimant's Residual Function Capacity ("RFC") must be determined in the fourth step. The RFC is what the claimant can still do despite the limitations caused by the medical impairments. 20 C.F.R. §§ 404.1545, 416.945.

In the fourth step, the BDD must determine whether the claimant, given her RFC, can perform her past work. If so, benefits are denied. 20 C.F.R. §§ 404.1520(e), 416.-920(e). In the fifth step, the BDD also uses the claimant's RFC to determine whether the claimant can perform other work. If no other work exists, the claimant is considered disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.-1520(f), 416.920(f).[5]

■ In using the five step analysis to determine who is entitled to benefits, the BDD must follow the relevant federal statutes and regulations. The BDD must "consider all evidence" and develop a "complete medical history" in determining who is entitled to benefits. 42 U.S.C. § 423(d)(5)(B).

For the BDD, the collection of the evidence involves five key participants. The first of these is the claimant who has the responsibility for furnishing his medical evidence. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a)–(b), 404.1514. The second key participant is the treating physician. The BDD has the responsibility to make reasonable efforts to contact the treating physician after obtaining the claimant's permission to request the needed medical information. *See* 20 C.F.R. § 404.1512(a). If the BDD requires additional information, then a consultative examination is needed.[6] The Act provides that the "Secretary shall make every reasonable effort to obtain from the individual's treating physician ... all medical evidence ... necessary in order to properly make such determination...." 42 U.S.C. § 423(d)(5)(B).

If for some reason the treating physician cannot conduct the consultative examination, then another physician may perform it. The physician who performs the consultative examination stands as the third key participant in the collection of evidence. This physician should include clinical and laboratory findings and a medical assessment of the claimant's work-related capabilities. 20 C.F.R. § 404.1513.

The remaining two participants in the disability determination process are the BDD disability examiner and the BDD staff physician. They are responsible for the development and evaluation of disability claims at the initial and reconsideration levels.

The disability examiner should collect, interpret, and evaluate all the medical information. The disability examiner is a non-medical employee. The disability examiner should determine the capacities of a claimant to perform substantial gainful activities. *See* 20 C.F.R. § 404.1615(c). The

process as conducted by the BDD. However, this Court recognizes that the same five step review process is utilized in all levels of the appeals process.

**5.** The evaluation process is applied differently to claimant's for widows' and children's benefits. Children and widows must meet or equal the Listings of Appendix 1 in order to be found disabled. 20 C.F.R. §§ 404.1578, 416.924.

**6.** In reality, the BDD has authority to purchase consultative examinations. *See* 20 C.F.R. § 404.1517.

disability examiner must first consider the medical evidence submitted by the treating physician, as well as specialists who have treated the client, hospitals, clinics, and the like. If the disability examiner does not have enough information, then he may require a consultative examination. 20 C.F.R. § 404.1517.

The disability examiner should consult with the staff physician for technical advice on the significance of the medical findings. The staff physician has the ultimate responsibility for RFC assessments and other medical judgments. 20 C.F.R. § 404.1546.

## THE PLAINTIFFS' CLAIM

The plaintiffs challenge the policies, practices, and procedures of the BDD and HHS. The plaintiffs allege that the BDD has not followed the directives of the Social Security Act and the accompanying regulations.

Specifically, the plaintiffs have six basic claims against the BDD. They claim that the BDD has (1) not requested medical assessments from treating and consultative sources; (2) not requested consultative examinations from treating physicians; (3) not given the proper weight to the opinions of treating physicians; (4) improperly utilized guidelines to determine claimants' RFCs; (5) improperly used a procedure whereby disability examiners determined claimants' RFCs; and (6) provided claimants with denial notices which failed to properly inform claimants of their appeal rights and did not include meaningful discussions of the medical evidence and reasons for denial. Amended Complaint, doc. 5, at 2.

The plaintiffs seek to compel changes in the disability determination program. In some instances, the plaintiffs initially requested this Court to compel have already been made voluntarily. The plaintiffs' claim is not moot, however, because the plaintiffs are also seeking to reopen the disability benefit determinations of all individuals in Ohio who had their disability

claims denied or rescinded during the last seven years. Amended Complaint, doc. 5, at 24, 25; Plaintiff's Motion for Summary Judgment and Memorandum in Support, doc. 84, at 92–96. The matter before the Court is a class action.[7] The plaintiffs are composed of: "[a]ll persons who applied for and were denied, or were terminated from ... disability benefits since October 9, 1984...." Order, doc. 63, January 22, 1990, at 3 (affirming the Magistrate's recommendations and certifying the class). However, the class excluded claimants who were refused benefits because they subsequently resumed gainful activity. *Id.*

## SOCIAL SECURITY DISABILITY BENEFITS REFORM ACT OF 1984

In 1984, Congress amended the Social Security Act with the Social Security Disability Act of 1984 ("1984 Amendments"). Congress made the 1984 Amendments in response to the increase in the number of beneficiaries whose benefits had been terminated. H.R.Rep. No. 98–618, 98th Cong., 2nd sess., at 2 (1984), *reprinted in* U.S.Code Cong. & Ad.News pp. 3038, 3039. Congress feared that the SSA had erroneously cut off the benefits from some deserving beneficiaries. *Id.* Congress had three major purposes for enacting the amendments: (1) to clarify statutory guidelines for the determination process of who is entitled to disability benefits; (2) to improve the appeals process; and (3) to make the procedures conform with the notice and comment procedures of the Administrative Procedures Act. *Id.* Still, the overall purpose of the social security program remained to provide benefits only for those unable to work. *Id.* at 7.

Congress recognized that determining who is disabled and cannot work involves some degree of subjectivity. *Id.* at 6. However, Congress attempted to inject as much objectivity into the decision as possible:

---

**7.** The named plaintiff, Avril Day, originally filed his complaint on October 2, 1987. The complaint was later amended on December 4, 1987 to raise the challenges presented now before this Court. These challenges are on behalf of four named plaintiffs, including Mr. Day, and an unspecified number of unnamed plaintiffs.

In response to this inherent subjectivity, the disability determination process has developed into an elaborate system of checks and balances designed to prevent individual judgment from outweighing national policies defining who is totally disabled. The initial decision is made according to the submitted clinical findings, a deliberate paper decision that avoids as much as possible the personal influence of either the claimant or of his physician. The examiner's decision is then subject to several different kinds of reviews, through the quality assurance system and through a multi-layered appeals system, in an attempt to ensure as much objectivity as possible in an inherently subjective decision.

*Id.* At the same time, however, in adopting the 1984 Amendments, Congress placed special emphasis on the importance of individualized assessments of disability claims. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (adopting language emphasizing the importance of individual assessments).

### LEGAL DISCUSSION

In carefully analyzing the plaintiffs' six claims, this Court has concluded that the plaintiffs should prevail. As a result, the BDD must give notice to all class members that the BDD erred in their initial application for disability benefits. The notice must state that the class members may now reapply for disability benefits. In considering any reapplications for disability benefits, HHS and the BDD must comply with the Act and its regulations. In several areas, the activities of the BDD are or have been questionable. This Court orders HHS and the BDD to comply with the Act and the regulations in these areas as well. The BDD must comply with the Act and the regulations not only for those reapplying for disability benefits, but also for any new claimants as well.

In the interests of judicial economy, this Court will only discuss all of the plaintiffs' claims which require that HHS and the BDD reopen the claims of class members. This Court will analyze, however, the claims where the plaintiffs ask for equitable relief.

This Court will also discuss the plaintiffs' claims on which this Court grants summary judgment to the defendants.

### DISCUSSION OF PLAINTIFF'S SIX CLAIMS

### CLAIM ONE

#### Whether the BDD has requested medical assessments

The plaintiffs first claim that the defendants have not requested medical assessments from the treating and consultative physicians in contravention to the Act and the regulations.

#### *Part A*
#### Whether the BDD has requested medical assessments from treating physicians

This Court must first consider the plaintiffs' claim that the defendants have not requested medical assessments from claimants' treating physicians in violation of the Social Security Act.

A medical assessment is the treating physician's description of a claimant's ability to do work-related activities, such as sitting, standing, etc. 20 C.F.R. §§ 404.-1513(c), 416.913(c). The federal regulations provide that the BDD must obtain a medical assessment from a claimant's treating physician. 20 C.F.R. §§ 404.1513(b), 416.-913(b) and (c).

■ The question before the Court is whether the BDD's procedures concerning medical assessments from treating physicians followed the Act and its accompanying regulations. The plaintiffs contend that the BDD did not obtain proper medical assessments from treating physicians at the initial and reconsideration levels. Brief for Plaintiffs, doc. 84, at 20. The BDD, on the other hand, claims that it has followed the regulations and has obtained the requisite medical assessments.

The plaintiffs note that the BDD collects medical information about claimants usually by sending a letter to the treating physician which provides a standard introduction and conclusion and a choice of specific

questions grouped by impairment. Brief for Plaintiffs, doc. 84, at 20. In addition, the BDD specifically crafted questions for a given claimant. *Deposition of Sue Stone Askey*, ("Askey Dep."), at 104.

Prior to 1987, the questions primarily tracked the clinical and laboratory test results needed to meet the listings of impairments in Appendix One. The BDD did not ask any questions specifically inquiring about a claimant's ability to do work-related activities, such as sitting, standing, or lifting. After 1987, the BDD made changes in the questions it submitted to treating physicians. Specifically, the BDD added a question to the bottom of its standard letter. The question has changed several times over the last few years, but now reads:

> Based on your objective findings, if the patient is of working age, please give an assessment of the patient's ability to do work related activities, such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking traveling and if there is a mental impairment, the ability to reason, make occupational, personal or social adjustments.

Exs. 16, at 1, 17.

This question complies with the Act and accompanying regulations because it directly asks the treating physician about a claimant's ability to do work-related activities as required under 20 C.F.R. §§ 404.-1513(c), 416.913(c).

However, the BDD left a space of less than an inch for a treating physician's response. This is inadequate. Leaving this much space encourages a cursory response from the treating physician. Nowhere does the Act or the regulations stipulate the amount of space that the treating physician must have to give his medical assessment. However, giving less than an inch goes against the spirit of the Act and the 1984 amendments of giving weight to the opinion of treating physicians.

Accordingly, the plaintiffs prevail on this claim. This Court orders that the BDD provide sufficient space for a treating physician to give her opinion of a claimant's ability to do work-related activities. The

BDD must request a medical assessment from treating physicians and provide room for an adequate response.

## Part B

### Whether the BDD should have contacted treating physicians at teaching hospitals and clinics

■ The plaintiffs next maintain that the BDD has not made a "reasonable effort" to obtain medical evidence from claimants' treating physicians under the Act, because the BDD does not contact treating physicians who practice at certain clinics and hospitals. In these cases, the BDD obtains existing medical records from the facility itself. *See e.g., Deposition of Alice Noonan,* ("Noonan Dep."), at 128–132.

The BDD customarily attempts to contact the claimant's treating physician at more than 65 per cent of the Ohio institutions from which it requests medical evidence. Supplemental Leyland declaration (July 31, 1991), attached to doc. 100, ¶ 3, at 4. At the remaining 35 per cent, the BDD does not routinely contact the treating physician, because of practical problems it has experienced in obtaining responses from treating physicians at these institutions. *Id.* These institutions are primarily teaching hospitals and clinics, which depend heavily on medical residents who often rotate assignments. *Id.*

The BDD asserts that this process constitutes a "reasonable effort" under the Act. The plaintiffs counter that the BDD is not fulfilling its obligation to make "every reasonable effort to obtain from the individuals's treating physician (or other health care provider) all medical evidence...." 42 U.S.C. § 423(d)(5)(B).

At many of the hospitals and clinics in question, multiple physicians treat the patient. Thus, the patient does not have a treating physician that she sees on a regular basis; rather, she sees whichever physician is on duty at that time. When the BDD has tried to directly approach physicians at teaching hospitals, the agency has encountered a delayed response, if any. Supplemental Leyland Declaration, ¶ 3, at

4, 5. In any event, the hospitals' response has generally come from the medical records department. *Id.* It would require an unreasonable effort for the BDD to contact all the treating physicians at every teaching hospital and clinic in Ohio.

Moreover, the rationale for deference to the treating physician stems from the fact that a treating physician has special insight into a claimant's condition because of a sustained doctor-patient relationship. *See Stamper v. Harris,* 650 F.2d 108, 111 (6th Cir.1981). With the hospitals and clinics in question, sustained relationship between doctor and claimant is not as likely. Instead, patients often see medical residents who frequently rotate assignments. Supplemental Leyland Declaration (July 31, 1991), attached to doc. 100, ¶ 3, at 4.

Therefore, this Court holds that the BDD's practice of receiving medical records directly from certain hospitals and clinics constitutes a "reasonable effort" under 42 U.S.C. § 423(d)(5)(B). Accordingly, this Court grants the defendants' motion for summary judgment on this issue.

### Part C
#### Whether the BDD paid a reasonable fee to treating physicians

■ The plaintiffs next maintain that the defendants have not paid treating physicians reasonable fees, and therefore have failed to make a "reasonable effort."

Physicians who supply medical evidence to the BDD upon request are "entitled to payment from the Secretary for the reasonable cost of providing such evidence." 42 U.S.C. § 423(d)(5)(A); *see* 20 C.F.R. § 404.-1514 (allowing payment to physicians "for the reasonable cost of providing us with existing evidence").

The plaintiffs point out that the BDD pays a set fee of $17.50 for reports by treating physicians, regardless of the report's length or complexity. Brief for Plaintiffs, doc. 84, at 27 (citing *Deposition of Leonard Herman,* ("Herman Dep."), at 68; Plaintiffs' ex. 73, at 17). The plaintiffs add that the BDD itself has recognized the inadequacy of its fees and asked HHS to increase them. Each year, the Secretary of HHS has refused to increase the fees. *Id.*

The regulations delegate to the BDD the authority to set the fee payments with approval from the federal government:

The State will determine the rates of payment to be used for purchasing medical or other services necessary to make determinations of disability. The rules may not exceed the highest rate paid by Federal or other agencies in the State for the same or similar type of service.

20 C.F.R. § 404.1624.

■ The provisions directing the BDD to pay "reasonable fees" allow the BDD to pay for medical services. These provisions were not designed to challenge the sufficiency of the BDD's payments; rather, they were designed to prevent excess spending by the BDD. Regulation 20 C.F.R. § 404.1624 grants the BDD authority to set the fee payments made by the BDD.

■ This Court's role is not to second-guess the BDD's complex decisions. *See Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984). The *Chevron* court reasoned that:

[j]udges are not experts in the field, and are not part of either political branch of Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

*Id.* at 865, 104 S.Ct. at 2793. The Secretary's determination over the fee schedule for treating physicians involves competing policies and concerns. Thus, this Court should give deference to the Secretary's decisionmaking on whether the BDD paid a reasonable fee to treating physicians.

Accordingly, this Court grants the defendants' motion for summary judgment on this issue.

### Part D
### Whether the BDD seeks medical assessments in disabled widows' claims

The plaintiffs next allege that the Secretary has refused to consider the functional capacity of claimants for widow's benefits.

The plaintiffs did not allege this claim in their complaint. *See* Amended Complaint, doc. 5. The plaintiffs may not use a summary judgment motion to raise a claim they did not plead in their complaint.

■ Moreover, the named plaintiffs cannot adequately represent a class claiming widow's benefits. A class action requires that the named parties have claims that are "typical of the claims ... of the class...." Fed.R.Civ.Pro 23(a). In the case before the Court, none of the named plaintiffs have stated claims for widow's benefits. Therefore, the named plaintiffs have not satisfied the typicality requirement for the plaintiffs' claims involving widow's benefits.

Accordingly, we grant the defendants' motion for summary judgment on this issue.

### CLAIM TWO
### Whether the BDD used a reasonable effort to have treating physicians perform consultative exams

■ In their second claim, the plaintiffs contend that the defendants have failed to make a reasonable effort to use treating physicians to perform consultative examinations.

The Social Security Act requires that the Secretary must make "every reasonable ef-fort" to have treating physicians perform consultative examinations. *See* 42 U.S.C. § 423(d)(5)(B); POMS DI § 22505.035 (contained in Plaintiffs' Appendix 9) ("use the attending physician where possible").

The BDD states that its "approach [to consultative examinations] is a function of the practical realities it contends with in attempting to process the claims of hundreds of thousands of applicants in a timely and reliable manner." Brief for Defendants, doc. 104, at 43. The BDD relies upon a panel of examiners for the vast majority of its consultative examinations. *Id.*

The defendants point out specific difficulties that the BDD experiences in having treating physicians perform consultative examinations. For instance, the BDD must perform the examinations within a certain time in order to ensure a timely processing of claims. *See e.g.,* Supplemental Leyland declaration, exs. H and I, Attached to doc. 100 (explaining that any treating physician/psychologist must schedule an examination within 7–10 days of the date contacted and submit a completed report no later than 7 days after the appointment date). The defendants also note that the consultant examiner must use the correct equipment. Supplemental Leyland declaration, ¶ 5, at 6, 7.

The defendants conclude that "[t]hese requirements limit the ready availability of appropriate treating physicians to do consultative examinations." Brief for Defendants, doc. 104, at 44 (citing Leyland declaration ¶ 10). Richard Leyland, Medical Administrator at the BDD claimed that many treating physicians will not perform consultative examinations when asked by the BDD. Leyland Supplemental Declaration, ¶ 4, at 5, 6 (attached to doc. 100).

Undeniably, the BDD must cope with numerous, and sometimes onerous, regulations. Nevertheless, this Court must enforce these regulations. The BDD must follow them. The BDD has not made "every reasonable effort" to have the treating physicians perform the consultative examinations as required under 42 U.S.C. § 423(d)(5)(B). In the 1988 and 1989 fiscal

years, the BDD obtained over 66,000 consultative examinations. Only 505 were scheduled with treating physicians. Brief for Plaintiff, doc. 84, at 41 (citing Plaintiffs' ex. 69 at 7; ex. 95 at 7; ex. 29 at 1–4).

Before 1987, the BDD did not request consultative examinations from claimants' treating physicians. *See e.g.*, Plaintiff's ex. 26. In 1987, the BDD began using treating physicians for consultative examinations but only if the treating physician appeared on the BDD's limited list of doctors. *Deposition of John Gozs*, ("Gozs dep."), at 23–25.

As Mr. Leyland has described, the BDD has had difficulties in getting treating physicians to cooperate. However, these difficulties do not vitiate the BDD's duty to make "every reasonable effort" to have treating physicians perform consultative examinations. The BDD's policy of only having those treating physicians perform consultative examinations named on a limited list is violative of the Act and the regulations. The BDD has not made the required reasonable effort to have treating physicians perform consultative examinations.

The case before this Court is analogous to *Samuels v. Heckler*, 668 F.Supp. 656 (W.D.Tenn.1986). In that case, the Tennessee Disability Determination Section admitted that treating physicians were rarely used to perform consultative examinations. The *Samuels* court held that the Tennessee agency had not followed the Social Security Act and the accompanying regulations. *Id.* The court remanded the case, ordering that the Tennessee agency use the treating physicians of class members for consultative examinations whenever possible. *Id.*

The BDD has acted in similar fashion to the Tennessee Disability Determination Section. The fact that the BDD must act promptly on claims does not vitiate the requirement that the BDD make "every reasonable effort." Nor does the requirement that the consultative examiner use the correct equipment excuse the BDD from making "every reasonable effort." The BDD has failed to comply with the Act

and its accompanying regulations concerning consultative examinations.

Accordingly, we grant the plaintiffs summary judgment on this issue.

## CLAIM THREE

### Whether the BDD gives sufficient weight to the medical assessments of treating physicians

The plaintiffs assert in their third claim that the BDD does not give sufficient weight to the medical assessments of treating physicians.

The medical opinions of treating physicians are entitled to great weight in determining whether a claimant may recover disability benefits. *Hardaway v. Secretary of Health and Human Services*, 823 F.2d 922, 927 (6th Cir.1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984). As a result of this policy, the opinion of a non-examining physician is entitled to little weight if the opinion is contrary to that of the treating physician's. *Shelman v. Heckler*, 821 F.2d 316, 821 (6th Cir.1987) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir.1985) (per curiam)).

Treating physicians are given deference because they may have special insights into the claimant's condition after repeated examinations of the claimant. *Stamper*, 650 F.2d at 111. Therefore, the BDD must "make every reasonable effort to obtain [necessary medical evidence] from the individual's treating physician." 42 U.S.C. § 423(d)(5)(B).

Once obtained, the opinion of the treating physician "is entitled to substantial deference only if it is supported by sufficient medical data...." *Shelman*, 821 F.2d at 321; *King*, 742 F.2d at 973 (treating physician's opinion should not be followed if it is "not supported by detailed, clinical diagnostic evidence").

Despite the weight given to the treating physician's assessment, the determination of whether a claimant is disabled is ultimately reserved for the Secretary or his designee. 42 U.S.C. §§ 423, 1382c(a)(3)(D). In the case before the

Court, the Secretary of HHS has delegated this responsibility to the BDD.

The regulations further reveal that the treating physician's opinion is not absolutely dispositive:

> ... a statement by ... [the claimant's physician] that ... [the claimant is] 'disabled' or 'unable to work' does not mean that we will determine that ... [the claimant] is disabled. We have to review the medical findings and other evidence that support a physician's statement that ... [the claimant] is disabled.

20 C.F.R. § 404.1527.

The courts, too, have recognized that "ultimately, the determination of disability is the prerogative of the Secretary, not the treating physician...." *Houston v. Secretary of Health and Human Services*, 736 F.2d 365, 367 (6th Cir.1986); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986) (quoting *Houston*); *Samuels*, 668 F.Supp. at 661 ("[t]reating physicians are neither entitled nor competent to make ultimate determinations of disability since such decisions rest on both medical and non-medical considerations"). Consequently, the treating physician cannot make the ultimate RFC assessment for a claimant either. 20 C.F.R. § 404.1546.

Moreover, Congress' attempt to inject objectivity into the determination as to who may receive social security benefits would be thwarted if treating physicians' opinions were absolutely dispositive. *See* S.Rep. No. 744, 90th Cong., 1st sess., at 30 (1967), *reprinted in* 1967 U.S.Code Cong. & Ad. News, 2834, 2882–83 ("... conclusions by others with respect to the nature or extent of impairment or disability does not establish the existence of disability for purposes of Social Security benefits based on disability unless they are supported by clinical or laboratory findings or other medically acceptable evidence confirming such statements or conclusions"). Rather, in adopting Titles II and XVI, Congress understood the value of treating physicians' opinions, but also recognized the need for uniformity in social security decision making.

In sum, the BDD must give the treating physician substantial deference, but ultimately "the determination of disability must be made on the basis of the entire record and not only on some of the evidence to the exclusion of all other relevant evidence." *Hardaway*, 823 F.2d at 927.

The plaintiffs allege that the BDD does not give sufficient weight to the opinions of treating physicians in its determination of whether a claimant is eligible for disability benefits. The plaintiffs cite several illustrations.

First, the plaintiffs note that the BDD does not seek the treating physician's assessment of the claimant's functional capacities. However, as this Court has discussed above, the regulations require that a "[s]tate agency staff medical or psychological consultant must assess residual functional capacity where it is required." 20 C.F.R. §§ 420.1546. The regulations do not require that the treating physician assess the residual functional capacity of claimants. The regulations only require that the BDD give deference to the treating physician's opinions.

Second, the plaintiffs argue that the BDD has failed to properly instruct its staff concerning the deference given to the opinions of treating physicians. The defendants disagree, citing several examples of proper instructions to the BDD's staff. This Court finds particularly persuasive the POMS adopted in March, 1986, which emphasized that a treating physician's opinion may only be rejected if "the rationale in the determination [is] sufficiently compelling to clearly rebut the opinion." Brief for Defendants, doc. 88, at 30 (quoting POMS DI § 24510.001). Therefore, this Court finds that the BDD properly instructed its staff.

Third, the plaintiffs point to the example of class member David Wheeler. David Wheeler's two treating physicians stated that he would be unable to work because of various medical problems. The BDD disagreed and found that Mr. Wheeler could do light work. The BDD noted the treating physicians' opinions, but dismissed them because they were inconsistent with the objective medical evidence. Plaintiffs' ex.

67, at 14. The ALJ reversed the BDD's decision, relying primarily upon the opinions of Mr. Wheeler's treating physicians.

This Court does not find Mr. Wheeler's experience as sufficient evidence to conclude that the BDD has not followed the Social Security Act and regulations for two reasons. First, in Mr. Wheeler's claim, the BDD did not accept the treating physician's opinion because it did not square with the rest of the evidence. The BDD must give substantial deference to the opinion of the treating physician, but only if it is supported by sufficient medical data. *Shelman*, 821 F.2d at 321. In Mr. Wheeler's case, the BDD considered the opinion of the treating physicians, but concluded that all the evidence in the file led to a different conclusion. Plaintiffs' ex. 67, at 14. These actions by the BDD are not inconsistent with the Act and the regulations, because the plaintiffs have not demonstrated that the BDD did not give substantial deference to the opinions of Mr. Wheeler's treating physicians.

Second, Mr. Wheeler's experience is not sufficient evidence to conclude that the BDD has violated the Social Security Act for the entire class. The fact that an ALJ disagreed with the decision of the BDD in a single case does not necessarily show widespread impropriety by the BDD. The Supreme Court has cautioned that a single wrongful denial of benefits should not be relied upon in a challenge to a "massive benefits program provided by Congress." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 324 n. 11, 105 S.Ct. 3180, 3190–91 n. 11, 87 L.Ed.2d 220 (1985) (challenging the distribution of Veterans Administration benefits). Therefore, the plaintiffs have not demonstrated that the BDD gave insufficient weight to the opinions of treating physicians to justify class-wide relief on the third claim.

Accordingly, this Court grants the defendants summary judgment on the plaintiffs' third claim.

**8.** This Court will often refer to the RFC guidelines to mean both the RFC guidelines and the

## CLAIM FOUR

### Whether the BDD made individualized assessments of claimants

In claim four, the plaintiffs assert that the BDD has violated the Social Security Act by determining claimants' severity of impairments and their RFC based upon unpublished guidelines rather than individual assessments of claimants.[8] In 1983, the BDD enacted the "RFC guidelines." The RFC guidelines set forth criteria for helping to determine whether various impairments were deemed severe. If the claimant's impairment was deemed severe, then the RFC guidelines helped to determine the RFC.

The plaintiffs argue that the BDD's policy of seeking exclusively objective medical data from treating physicians left a major gap in the evidence concerning claimants' disabilities. Brief for Plaintiffs, doc. 84, at 45. The plaintiffs state that the BDD has filled this gap by devising a set of presumptions concerning the degree of functional limitation resulting from the most common categories of physical impairments. *Id.*

The plaintiffs conclude that disability examiners use these presumptions in the RFC guidelines and decide the degree of functional impairment of a claimant without reference to treating doctors' opinions. The plaintiffs argue that this process denies claimants the individualized assessments of a claimant's disabilities as required under the Act. *Id.* at 45, 46.

The defendants declare that the guidelines in question "were used only as suggestions and 'signposts' to assist physicians ..." in making their determinations about the severity of a claimant's impairment and his RFC. Brief for Defendants, doc. 104, at 19. The defendants assert that the RFC guidelines did not operate as binding presumptions precluding individualized review. *Id.*

severity guidelines.

## Part A

### Whether the RFC guidelines denied claimants an individualized assessment

The Social Security Act requires that the BDD must review each claimant's file on an individualized basis. *Heckler v. Campbell,* 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983). Courts have enjoined mandatory rules or presumptions that preclude individualized assessments. *See e.g., Samuels,* 668 F.Supp. at 663.

The plaintiffs claim that the RFC guidelines for physical impairments precluded an individualized assessment. The plaintiffs assert that "[o]ther evidence such as the claimant's symptoms and the clinical judgment of physicians is excluded from the guidelines." Brief for Plaintiffs, doc. 84, at 51. The plaintiffs note the mandatory nature of the RFC guidelines by citing the example that "fibromyositis is always a not severe impairment, unless accompanied by other underlying medical problems" under the guidelines. Plaintiffs' ex. 37, at 3.

Moreover, the plaintiffs contend that the RFC guidelines excluded categories of "exertional function" for many impairments. For example, under the RFC guidelines there is no sedentary RFC category for respiratory, cardiac, or gastrointestinal impairments. *See e.g.,* Plaintiffs' ex. 36, at 11–15. The plaintiffs contend that this exclusion of exertional function categories may have resulted in a claimant who had an impairment of one of those body systems who was presumed to be capable of at least light work, regardless of individual circumstances. Plaintiffs' ex. 41, at 4. Such a result is counter to the requirement of an individualized assessment for each claimant's claim for disability benefits.

On the other hand, the BDD contends that the RFC guidelines were not mandatory directives, but rather suggestions in how BDD officials should begin to analyze social security disability claims. The RFC guidelines were prefaced with instructions on their use. The language in these instructions varied slightly over the years.

Plaintiffs' exhibit 35 serves as an illustrative example for the defendants. In this exhibit, the instructions provided that they should "be applied only when the file contains all relevant evidence, documentation is adequate to assess severity of the impairment and the listing is not met or equal[l]ed [sic]." Plaintiffs' ex. 35, ¶ 1, at 1. The instructions also stated that the RFC guidelines are

... addressed to both examiners and physicians. When an examiner finds the results suggested by these guides are inconsistent with the impression of severity obtained by review of the entire file, or when the circumstances of the case do not fit the situation described in the guides, medical advice should be obtained.

*Id.* at ¶ 3. Finally, the instructions to the RFC guidelines directed that "[t]he claimant's allegations must be considered in the rationale for the RFC established." *Id.* at ¶ 4.

Clearly, if the BDD supplanted the RFC guidelines for the Social Security Act and its accompanying regulations, the BDD violated the law. *See City of New York v. Heckler,* 578 F.Supp. 1109, 1124 (E.D.N.Y. 1984), *aff'd,* 742 F.2d 729 (2d Cir.1984), *aff'd sub nom, Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (instructions invalidated because they precluded an individualized assessment of mental impairments).

The BDD claims that it construed the RFC guidelines as only "signposts." The defendants point out that the RFC guidelines were only "background materials" for "considering RFC's." *Herman Dep.,* at 248, 259. Many BDD examiners and physicians stated that they used the RFC guidelines only as starting points, suggestions, and background information. *Deposition of James Shumaker,* ("Shumaker Dep."), at 146; *Deposition of James Smailes,* ("Smailes Dep."), at 137; *Deposition of Dennis Morgan,* ("Morgan Dep."), at 79; *Deposition of Paul Dillahunt,* ("Dillahunt Dep."), at 42.

Dr. Paul Dillahunt, a consultant at the BDD explained that the RFC guidelines

were " ... signposts that indicate the proper path to take, but they're not set in concrete. You have to utilize the entire file plus your experience and expertise to arrive at a decision." *Dillahunt Dep.*, at 109. The defendants summarize that "the fact merely that the Quality Assurance Unit found the [RFC] guidelines to be *relevant* does not mean they were considered *binding.*" Brief for Defendants, doc. 88, at 45 (emphasis in original).

On the other hand, the plaintiffs contend that the BDD did in fact consider the RFC guidelines to be binding. The plaintiffs cite to instances where the BDD Quality Assurance Unit approved or overruled BDD staff doctors' opinions based upon the RFC guidelines. Brief for Plaintiffs, doc. 84, at 53 (citing Plaintiffs' exs. 42–53). In one exhibit, for example, Dr. Dillahunt, overruled the conclusion of the BDD staff physician regarding the RFC of a claimant, citing the RFC guidelines. Plaintiffs' ex. 43; *Dillahunt Dep.*, at 87.

## Part B
### Whether the RFC guidelines preclude consideration of the combined effects of impairments

The plaintiffs next contend that the BDD's guidelines failed to follow the directive that the BDD consider the combined effect of non-severe impairments. *See* 42 U.S.C. § 423(d)(2)(B) ("Secretary shall consider the combined effect of all the individual's impairments").

The plaintiffs claim that BDD officials have admitted to not considering the combined effect of non-severe impairments. The plaintiffs asked Dr. Dillahunt in his deposition what would happen if a person had two different impairments, but neither alone was severe. Dr. Dillahunt answered that "I would be careful to put in the medical advice that the combination of impairments would not preclude the claimant from performing substantial gainful activity." *Dillahunt Dep.*, at 132, 133.

The defendants dispute this contention. The BDD states that the BDD did not use these guidelines as conclusive, but rather treated them as suggestions. Many members of the BDD staff stated that they never relied on the guidelines to exclude consideration of all evidence for severity determinations. *See e.g., Smailes Dep.*, at 129; *Shumaker Dep.*, at 139; *Deposition of Lisa Jones*, at 141.

## Part C
### Whether the BDD guidelines are still in effect

The BDD officially withdrew the RFC guidelines in 1989. The plaintiffs contend, however, that the BDD is still secretly using the RFC guidelines. Consequently, the plaintiffs ask this Court to enjoin the defendants from using the RFC guidelines. The defendants contend that the BDD discontinued using the RFC guidelines in 1989.

In 1989, the Secretary of the SSA instructed the BDD to discontinue using the RFC and severity guidelines. The plaintiffs contend that despite this order, the BDD continued using these guidelines. Plaintiffs' ex. 54. The question is whether the BDD did, indeed, stop using the RFC guidelines as required under the law.

The BDD sent notices to its staff physicians stating that "the use of any structured guides is being discouraged by Regional Office." Plaintiffs' ex. 39, at 1. The notices added that the RFC Draft Guides " ... are to be removed from our manuals." *Id.*

The plaintiffs assert that the "mere 'deletion' of the guidelines does not bring defendants into compliance with the Social Security Act." Brief for Plaintiffs, doc. 84, at 58. The plaintiffs argue that the RFC and severity guidelines remain unwritten policy at the BDD to this day.

## Part D
### The Court's Resolution Regarding Use of the RFC Guidelines

██ In carefully reviewing this issue, we conclude that the BDD's actions concerning the RFC guidelines are questionable. However, this Court cannot conclude that the BDD supplanted the regulations with the RFC guidelines.

Because this Court concludes that the BDD must reopen the cases of class members based upon other claims by the plaintiffs, this Court enjoins any use of the RFC guidelines for the class members who reinitiate their respective claims for social security disability benefits. Furthermore, this Court enjoins any use of the RFC guidelines for any new claims for social security disability benefits.

### Part E
### Whether the RFC guidelines violated the APA

■ Furthermore, the plaintiffs contend that the BDD's RFC guidelines violated the notice, comment, and publication requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 552, 553. The APA requires that federal agencies publish "substantive" agency rules in the Federal Register in order to allow the public to comment on the proposed regulations. 5 U.S.C. § 553(b), (c); *McCown v. Secretary of Health and Human Services*, 796 F.2d 151, 157 (6th Cir.1986), *cert. denied*, 479 U.S. 1037, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987).

■ However, the APA exempts from the notice, comment and publication requirements "interpretative rules, general statements of policy or rules of agency organization, practice, or procedure." 5 U.S.C. § 553(b). These exemptions allow an agency flexibility in establishing procedure. *See American Hospital Assoc. v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987).

■ The issue presented is whether the RFC guidelines were substantive, and thus subject to the notice, comment, and publication requirements, or whether they were interpretative rules, and thus not subject to the notice, comment, and publication requirements. Substantive rules are ones which grant rights, impose obligations, or significantly effect private interests. *State of Ohio Dept. of Human Services v. U.S.*

*Dept. of Health & Human Services*, 862 F.2d 1228, 1233 (6th Cir.1988). In contrast, interpretative rules are those which merely clarify or explain existing law or regulations. *Id.*

In the 1984 Amendments to the Social Security Act, Congress intended the APA notice, comment, and publication requirements to apply to new policies and procedures of the SSA which "could be reasonably expected to have an impact on findings of eligibility." S.Rep. No 466, 98th Cong., 2d sess. 19 (May 18, 1984).[9]

■ The RFC guidelines could reasonably be expected to have an impact on the findings of eligibility. The defendants suggest that the RFC guidelines were merely "suggestions" or "signposts," rather than binding rules. Assuming this to be true, the RFC guidelines still would have an impact on the findings of eligibility. The RFC guidelines would serve as the "suggestion" or "signpost" for the BDD official considering whether to grant disability benefits. Thus, this Court concludes that a "suggestion" or "signpost" could reasonably be expected to have an *impact* on the findings of eligibility.

The court in *Minnesota Mental Health Ass'n. of Minnesota v. Schweicker*, 554 F.Supp. 157 (D.Minn.1982), *aff'd in part and modified in part on other grounds*, 720 F.2d 965 (8th Cir.1983), considered the SSA's unpublished policy of presuming an RFC for mental impairments. The court held that the SSA's policy violated the APA because it had a "serious, substantial impact on the rights of persons subject to agency regulations". *Id.* at 167. Similarly, we find that the BDD's RFC guidelines were substantive because they granted rights, imposed obligations, and significantly effected private rights.

Accordingly, this Court holds that the RFC guidelines of the BDD violated the notice, comment, and publication requirements of the APA. As a result, the BDD

---

9. Congress also desired that the SSA retain flexibility in responding to changes in the social security program. *Id.* As discussed more fully in the text, this Court holds that the BDD's flexibility in dealing with the social security program would not have been seriously hampered by complying with the APA. Rather, because the RFC guidelines were substantive rules, they should have followed the notice, comment, and publication requirements of the APA.

must allow class members to reapply for disability benefits.

## CLAIM FIVE

### Whether disability examiners made RFC assessments

In their fifth claim, the plaintiffs challenge an internal operating procedure, used by the BDD up until the middle of 1988, whereby the plaintiffs assert that the disability examiners, not the doctors, actually completed the RFC assessments in violation of the Act and its accompanying regulations. In response, the defendants state that the BDD physician independently examined the evidence and made his own judgment about a claimant's RFC.

■ The regulations provide that "[i]n cases where the state agency makes the disability determination, State agency staff medical or psychological consultant must assess residual functional capacity where it is required." 20 C.F.R. § 404.1546. Thus, a doctor or psychologist must make a claimant's RFC determination. *See* 42 U.S.C. § 421(h); 20 C.F.R. §§ 404.1546; 416.920a(d); 416.946.

The plaintiffs challenge the BDD's procedure used to determine a claimant's RFC prior to 1988. The disability examiner, a non-medical professional, collected the medical evidence and completed all the necessary paperwork. *Smailes Dep.*, at 91, 92. Moreover, the BDD's practice was to have a disability examiner "complete" the RFC if she felt confident in doing so. Plaintiffs' exs. 57, 58. A BDD staff physician then had to "sign out" on the claim file. Plaintiffs' exs. 60, 61. Under the BDD's "sign out" procedure, doctors were supposed to review the files, and if they disagreed with a medical determination, they were supposed to return the claim to the disability examiner with an explanation for the disagreement. Plaintiffs' ex. 60, at 3.

We agree with the defendants' contention that "as long as the final RFC assessment is made by the physician based on his independent review of the evidence, the agency medical staff has assessed RFC in full compliance with the regulations." Brief for Defendants, doc. 104, at 27.

The defendants present evidence indicating that BDD staff physicians conducted independent reviews to determine a claimant's RFC. In January 1984, the SSA published POMS DI § 00401.651.E, which provided that "the responsibility for RFC is reserved to the DDS [the BDD in Ohio] staff physician...." *See* Brief for Defendants, doc. 88, at 62 (POMS cited in defendants' brief). The defendants cite to numerous instances of deposition testimony indicating that a BDD staff physician independently reviewed the evidence in determination of a claimant's RFC. *See e.g., Deposition of William Kelley*, at 132 (disability examiner's proposed RFC is "meaningless until I review and sign it").

In opposition, the plaintiffs contend that the BDD's "sign out" procedure was a procedure allowing the disability examiner to determine a claimant's RFC. This Court recognizes that the BDD's "sign out" procedure might have led to some superficial reviews by BDD staff physicians. As a BDD staff doctor noted, the "sign out" procedure provides "a greater chance of cursory review...." Plaintiffs' ex. 64. Thus, the plaintiffs argue that the BDD's procedure was counter to the requirement that the medical professional *assess* a claimant's RFC. *See* 20 C.F.R. § 420.1546.

In carefully analyzing this question, this Court holds that the actions of the BDD are questionable. However, we are unprepared to conclude that the BDD disability examiners made the RFC assessments for claimants.

Because the actions of the BDD have been questionable, this Court orders that the BDD " ... medical or psychological consultant[s] ... assess residual functional capacity where it is required." 20 C.F.R. § 404.1546. We do not anticipate that the BDD should have difficulties complying with this order as the BDD discontinued in 1988 the internal operating procedure which the plaintiffs claim encouraged disability examiners to determine RFC assessments.

## CLAIM SIX

### Whether the BDD's denial notices were proper

The plaintiffs contend in their sixth claim that the BDD's denial notices violated both their procedural due process rights and their rights under the Social Security Act. This Court finds that the denial notices were violative of the Constitution; therefore, this Court does not consider whether they followed the directives of the Social Security Act.

The plaintiffs challenge the BDD's denial notices that were used before February, 1990.

■ A claim of entitlement to social security benefits triggers due process protections. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process requires that the BDD must give claimants "notice reasonably calculated, under all the circumstances.... [that] apprise[s] the interested parties of the pendency of the action and afford[s] them an opportunity to present their objections." *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 13, 14, 98 S.Ct. 1554, 1562, 1563, 56 L.Ed.2d 30 (1978) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)).

The issue before the Court is whether the BDD's denial notices met this standard. The denial notices used by the BDD consisted of forms, containing appeal rights and other general information. The time restrictions for filing an appeal were stated in large, bold type. *See* Defendants' exs. 1–5 (attached to Defendants' Motion for Summary Judgment, doc. 88). In one form used for denying benefits in the initial level of review, the BDD warned claimants:

> If you think we are wrong, you can ask that the determination be looked at by a different person. This is called a reconsideration. **IF YOU WANT A RECONSIDERATION, YOU MUST ASK FOR IT WITHIN 60 DAYS, YOU MUST GIVE US A GOOD REASON FOR THE DELAY.**

Defendants' ex. 1 (emphasis in original). The denial notices also contained information prepared by the disability examiner concerning the claimant's particular situation.

■ The plaintiffs argue that "[t]he denial notices do not inform plaintiffs of the *res judicata* consequences of not appealing." Brief for Plaintiffs, doc. 84, at 81. To support their argument, the plaintiffs point out that the BDD acknowledged the alleged deficiency of their denial notices by recently revising them to include *res judicata* warnings. This Court does not consider subsequent changes by the BDD as indicative of earlier wrongdoing. For this Court to hold otherwise would have a chilling effect upon government agencies making positive changes. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968). Government officials might be reluctant to make such changes in the future out of concern that their actions would harm the government's interests in pending litigation.

■ Next, the plaintiffs contend that the BDD violated procedural due process as demonstrated by Congress' codification of the due process requirements for claimants of social security disability benefits. Omnibus Budget and Reconciliation Act 1990, § 5107(a)(1) and (2), P.L. 101–508. Specifically, Congress has recently required the SSA to include in all denial notices a clear description of the potential ramifications of reapplying rather than appealing. *Id.*

This Congressional requirement is irrelevant concerning the BDD's alleged abuses prior to February 1990. To hold otherwise, would be to require the BDD to be prescient and follow the future unspecified laws of Congress.

Despite disagreeing with the plaintiffs' first two arguments, this Court holds that the defendants' denial notices violated the plaintiffs' due process rights. Procedural due process provides a claimant with notice that is reasonably calculated "... to convey the required information...." *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657.

Courts have elaborated that the failure to inform a claimant of the consequences of filing a new application, instead of appealing the denial decision, violated the claimants' right to procedural due process. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir.1990) ("[r]equiring notices to accurately state how a claimant might appeal an initial decision does not impose a significant financial or administrative burden"); *Butland v. Bowen*, 673 F.Supp. 638, 641, 642 (D.Mass.1987) ("straightforward description of the claim-preclusion process would have proven an extremely valuable procedural safeguard").

The BDD included in every denial notice a leaflet which explained the significance of filing a timely appeal. The leaflets cautioned claimants that failure to observe the prescribed deadlines could result in the loss of their right to appeal their claim:

> Remember that you generally have only 60 days to appeal a decision after you receive a notice.... If you do not request the appropriate review on time, you may lose your right to that review, and you may not be eligible for the next step in the review process.... You do not have to go through all the review steps if you do not want to. For example, you may have a reconsideration and decide not to ask for any further review. In all cases, however, a reconsideration is the first step in the review process.

Defendants' ex. 6, at 2.

The leaflets adequately described to claimants the deadlines for their appeal. However, the leaflets did not describe the possible *res judicata* effects if a claimant chose to reapply rather than to appeal. The leaflets implied that a claimant could reapply or appeal without any significant ramifications from that decision. Thus, as the *Butland* court concluded, this language served "to mislead and deceive the disability applicant[s]" into believing that they still have "the right to file another application at any time," "even though a claimant did not seek an appeal, when in fact subsequent applications may be barred by the doctrine of *res judicata.*" 673

F.Supp. at 640 (quoting *Dealy v. Heckler*, 616 F.Supp. 880, 887 (W.D.Mo.1984)).

Given this implication from the BDD's leaflets, the BDD's denial notices failed to give claimants "notice, reasonably calculated under all the circumstances ... [that] apprise[s] the interested parties of the pendency of the action and afford[s] them an opportunity to present their objections." *Memphis Light*, 436 U.S. at 13, 14, 98 S.Ct. at 1563 (quoting *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657).

Accordingly, the BDD's denial notices violated procedural due process. As a result, class members are entitled to refile their claims for social security disability benefits.

## SUMMARY

Counsel for both sides of this case have put in an extraordinary amount of effort as evidenced by the lengthy and excellent briefing. This Court has carefully reviewed this case.

The essence of this case, simply put, is that the BDD has blundered. The plaintiffs are composed of those persons "... who applied for and were denied, or were terminated from, the receipt of [SSDI] or [SSI] disability benefits since October 9, 1984...." Order Affirming Magistrate, doc. 62, at 3. The BDD had a statutory duty to follow the law. The plaintiffs have demonstrated on a number of their claims that HHS and the BDD did not follow the Social Security Act and its accompanying regulations during the period in question. Therefore, because the BDD did not follow the Act and the regulations, class members are entitled to reapply for disability benefits.

Social security law was designed to ensure that deserving claimants receive disability benefits. Because the BDD has not followed the law, class members may have been improperly denied disability benefits. The only appropriate relief is to allow class members to reapply for disability benefits. In considering the claims of these class members, the BDD must follow the directives of the Code and the regulations.

In addition, this Court has issued injunctive relief in a number of areas. This Court finds that the BDD provided an insufficient amount of space for treating physicians to give their opinions as to whether claimants can perform work-related activities. Consequently, we order the BDD to provide sufficient space for treating physicians to give their opinions. Second, we order that the BDD use a reasonable effort to have treating physicians perform consultative examinations.

In several other areas, this Court finds that the activities of the BDD have been questionable. Because we are already ordering the BDD to allow class members to reapply for disability benefits, we further order that when the BDD considers these reapplications, the BDD must follow the directives of the Act and the regulations. Specifically, we enjoin any further use of the RFC guidelines. We also order that the BDD's medical or psychological consultants assess residual functional capacity where the regulations require it.

We have taken these equitable actions to ensure that all applicants for disability benefits receive the rights they possess under the law. Accordingly, we order HHS and the BDD to follow the Code and the regulations for both class members reapplying for benefits and for new claimants as well.

SO ORDERED.

## ORDER OF CLARIFICATION

This matter is before the Court on the following matters: the Plaintiffs' motion to clarify (doc. 113), the Defendants' motion to clarify (doc. 114), the Defendants' response to the Plaintiffs' motion to clarify (doc. 116), the Plaintiffs' response to the Defendants' motion to clarify (doc. 118), the Plaintiffs' reply (doc. 120), the Defendants' reply (doc. 121), the Plaintiffs' supplemental memorandum (doc. 126), the Defendants' motion to extend time (doc. 128), the Plaintiffs' response to the Defendants' motion to extend time (doc. 129), the Defendants' supplemental memorandum (doc. 130), and the Plaintiffs' reply to the Defendants' supplemental memorandum (doc. 133).

We first turn our attention to several preliminary matters. The Defendants moved to extend time to July 17, 1992 to file a supplemental memorandum. The Plaintiffs have not opposed this motion, provided they have leave to respond. During this litigation, this Court has allowed matters to be fully briefed and argued, with numerous supplemental memorandum filed. Therefore, we grant the Defendants leave and also grant the Plaintiffs leave to respond. In sum, this Court has considered all items filed with the Court.

On November 22, 1991, this Court granted partial summary judgment for the Plaintiffs on certain issues and for the Defendants on certain issues (doc. 110) [hereinafter "Order" or "November 22, 1991 Order"]. The Court concluded that the Ohio Bureau of Disability Determination ("BDD") did not follow federal law in determining whether class members were entitled to social security disability payments. The Order we write now is a clarification of the November 22, 1991 Order.

## THE REQUIRED RELIEF

Both parties agree that confusion exists as to whether class members are entitled to "reapply" for benefits or whether their claims are "reopened." At the time of its earlier Order, this Court was unaware of the profound semantic difference between "reapply" and "reopen." Cf. 20 C.F.R. §§ 404.610 et seq. and §§ 416.310 et seq. with 20 C.F.R. §§ 404.987–996 and §§ 416.-1487–1494. In its earlier Order, this Court concluded that because the BDD did not follow the law, class members may have been improperly denied disability benefits. The only just relief is to allow the cases of class members to be reopened. See Bowen v. City of New York, 476 U.S. 467, 485, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986) (in ordering the reopening of cases the district court "... did no more than the agency would have been called upon to do had it, instead of the District Court, been alerted to the charge than an undisclosed procedure was illegal and had improperly resolved innumerable claims"). As the Defendants recognize, under reopening, the

agency would be required to determine whether a claimant met the criteria for entitlement to disability benefits at any time beginning with the prior application.

While this Court recognizes that this decision poses a difficult burden for the BDD, that fact does not provide a legitimate reason to penalize innocent class members who may have been improperly denied disability benefits. The BDD's errors were not "technical violations" as the Defendants have categorized them; but rather, the Defendants errors may have resulted in the improper denial of social security benefits. Therefore, the proper resolution of this matter requires that the claims of class members be reopened.

The Plaintiffs ask the Court to order the parties to present proposals within thirty days for the implementation of the relief ordered by the Court in order to insure that relief is provided effectively. Such a presentation is unnecessary, as we expect the parties to proceed in good faith and cooperate with one another in light of this Court's Orders. Problems encountered in complying with this Court's Orders, if any, will be dealt with at that time, not prematurely.

## MEDICAL ASSESSMENTS FROM CONSULTATIVE PHYSICIANS

Although the Court ruled that the Defendants failed to request sufficient medical assessments from treating physicians, it did not specifically address the alleged failure of the BDD to obtain medical assessments from consultative examiners. Therefore, the Plaintiffs have asked the Court to rule on this issue.

■ The reasoning underlying this Court's holding that the Defendants did indeed request a medical assessment from treating physicians is applicable to the Defendants' request for information from consultative examiners. Consultative examiners are required to answer a range of ques-

tions concerning the claimant's ability to function. *See* Plaintiffs' exs. 19, 20, 23, and 24. In addition, since March 1990, the question that more generally addresses functional capacity, already held by this Court to comply with the Act, has also been given to consultative examiners.[1] Therefore, we conclude that the BDD has required consultative examiners to provide medical assessments.

## MEDICAL REPORTS FROM DOCTORS AT TEACHING HOSPITALS

■ In its November 22, 1991 Order, this Court held that the Defendants' practice of receiving medical records directly from certain hospitals and clinics constitutes the requisite reasonable effort under 42 U.S.C. § 423(d)(5)(B) (1992). Order, at 15.

The Plaintiffs request this Court to order prospective injunctive relief in light of regulations issued August 1, 1991. No evidence has been presented to this Court how, or even if, the Defendants are violating or will violate the new regulations. We believe that the issuance of such an injunction is unwise at this point. *See McLendon v. Continental Can. Co.*, 908 F.2d 1171, 1182 (3d Cir.1990) (permanent injunctive relief should only be granted where the threat of harm exists, not just where the potential for harm exists).

## WIDOWS' BENEFITS

■ In essence, the Plaintiffs ask this Court to reconsider its ruling granting the Defendants' summary judgment on the issue of medical assessments for widows. This Court has carefully reexamined the Plaintiffs' Amended Complaint, and cannot find a "short and plain statement" of the Plaintiffs' claim for widows' benefits. *See* Fed.R.Civ.P. 8(a)(2). Therefore, this Court reaffirms its earlier holding that the Plaintiffs' may not now inject a claim for widows' benefits.

---

1. Furthermore, the Court's finding in its November 22, 1991 Order that the space allotted for a response to the March 1990 question might act as a constraint on a treating physician's ability to fully address a claimant's ability to function is not applicable to consultative examiners. In consultative examinations, examiners are required to answer several questions addressing specific functional capacity. Consequently, consultative examiners have had ample opportunity to provide detailed information concerning a claimant's functional capacity.

However, this Court wishes to clarify that claimants of widows' benefits remain class members, and thus are entitled to any relief to which other class members are entitled.

SO ORDERED.