Arvil M. DAY, Rosetta Brown, Arleathea Clide, Margaret Kinsler, and the class they represent, Plaintiffs–Appellees, Cross–Appellants (92–4208),

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant–Appellant, Cross–Appellee (92–4209),

Leonard Herman and Linda Krauss, in their official capacities, Defendants–Appellants, Cross–Appellees (92–3963).

Nos. 92–3963, 92–4208 and 92–4209.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 12, 1993.

Decided May 12, 1994.

Nancy L. Brock, John E. Schrider (argued), Legal Aid Soc. of Cincinnati, Cincinnati, OH, for plaintiffs-appellees in No. 92–3963.

Frank A. Rosenfeld (argued and briefed), U.S. Dept. of Justice, Civil Div., William Kanter, U.S. Dept. of Justice, Civil Div., Appellate Staff, Washington, DC, for Secretary of Health and Human Services in No. 92–3963.

Rita S. Eppler (argued and briefed), Jack W. Decker (briefed), Office of the Atty. Gen. of Ohio, Columbus, OH, for Leonard Her-

man, Linda Krauss in Nos. 92–3963, 92–4208 and 92–4209.

Nancy L. Brock, John E. Schrider (argued and briefed), Karen Litkovitz, Legal Aid Soc. of Cincinnati, Cincinnati, OH, for Arvil Day and Rosetta Brown in Nos. 92–4208 and 92–4209.

Nancy L. Brock, John E. Schrider, Legal Aid Soc. of Cincinnati, Cincinnati, OH, for Arleathea Clide, Margaret Kinsler in Nos. 92–4208 and 92–4209.

Frank A. Rosenfeld (argued and briefed), U.S. Dept. of Justice, Civil Div., William Kanter, U.S. Dept. of Justice, Civil Div., Appellate Staff, Brian G. Kennedy, Karen Stewart, Victoria Rosenthal, U.S. Dept. of Justice, Civil Div., Washington, DC, for Secretary of Health and Human Services in Nos. 92–4208 and 92–4209.

Before: MILBURN and BATCHELDER, Circuit Judges, and COHN, District Judge.*

COHN, District Judge, delivered the opinion of the court, in which MILBURN, Circuit Judge, joined.

BATCHELDER, Circuit Judge (pp. 1067–71), delivered a separate opinion concurring in part and dissenting in part.

## I. INTRODUCTION

COHN, District Judge.

This is a class action social security case. Appellants, the Secretary of Health and Human Services (Secretary) and Ohio Bureau of Disability Determination (BDD), appeal the grant of class wide relief to respondents requiring the reopening of applications for disability benefits by class members. Class members are all persons who applied for and were denied, or were terminated from, the receipt of disability benefits by the BDD since October 9, 1984.[1] The District Court found that the BDD had failed to comply with the Social Security Act (the Act) and accompanying regulations by not properly obtaining medical assessments and consultative examinations from treating physicians, using unpublished guidelines in the determi-

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The class excludes persons who were denied or terminated because they returned to substantial gainful activity, or for reasons not related to disability.

nation of claimants' residual functional capacities, and issuing inadequate notices of denial of benefits. For the reasons that follow, the District Court will be affirmed in part and reversed in part.

## II. BACKGROUND

### A.

The crux of this case is whether the Secretary and the BDD have complied with the Act and its accompanying regulations in the procedures for obtaining medical assessments and consultative examinations from treating physicians, the use of guidelines in the determination of claimants' residual functional capacities, and in the denial notices sent to class members. Plaintiffs' challenge is not to the validity of the Act and relevant regulations, but to the practices of the BDD. *Day v. Sullivan*, 794 F.Supp. 801, 806 (S.D.Ohio 1991). Plaintiffs allege that the BDD has failed to comply with the Act and accompanying regulations with regard to the development and evaluation of medical evidence, and in the form of the denial notices sent to class members. The District Court "concluded that plaintiffs should prevail," and ordered that class members must be allowed to reopen their applications for disability benefits.

### B.

The Secretary has designated state agencies such as the BDD to make disability determinations in accordance with the pertinent provisions of the Act and accompanying regulations. 42 U.S.C. § 421(a)(1–2). A person who has become disabled may apply for disability benefits. In Ohio, an application is first made to the BDD. The BDD must determine if the claimant meets the federal requirements for receiving disability benefits. If the claimant disagrees with the BDD's determination, the claimant may ask the BDD for reconsideration. *Day*, 794 F.Supp. at 806. After reconsideration, a claimant may appeal to an administrative law judge (ALJ). *Id.* ALJ decisions may be appealed to the Secretary's Appeals Council. *Id.* Decisions of the Appeals Council may be appealed to a United States District Court. *Id.* This case involves the BDD's practices at the initial and reconsideration stages of review.

At each level of review, a five step analysis is used to evaluate a claimant's application for disability benefits, under 20 C.F.R. § 404.1520. Under this analysis, the BDD or Secretary must determine whether a claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment or combination of impairments, (3) meets or equals an impairment listed in the appropriate appendix, (4) is prevented by her impairment or combination of impairments from engaging in her relevant past employment, or (5) has the ability to engage in other gainful activity, considering the claimant's age, education, past relevant experience, and residual functional capacity.[2]

While performing the five-step analysis to determine if a claimant is entitled to receive disability benefits, the BDD must "consider all evidence" and develop a "complete medical history" of the claimant. 42 U.S.C. § 423(d)(5)(B). The District Court explained the process of collecting medical evidence:

> For the BDD, the collection of the evidence involves five key participants. The first of these is the claimant who has the responsibility for furnishing his medical evidence. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a)–(b), 404.1514. The second key participant is the treating physician. The BDD has the responsibility to make reasonable efforts to contact the treating physician after obtaining the claimant's permission to request the needed medical information. *See* 20 C.F.R. § 404.1512(a). If the BDD requires additional information, then a consultative examination is needed. The Act provides that the "Secretary shall make every reasonable effort to obtain from the individual's treating physician ... all medical evidence ... necessary in order to properly make such determination...." 42 U.S.C. § 423(d)(5)(B).

---

**2.** Residual functional capacity (RFC) is "what the claimant can still do despite the limitations caused by the medical impairments." *Day*, 794 F.Supp. at 807.

If for some reason the treating physician cannot conduct the consultative examination, then another physician may perform it. The physician who performs the consultative examination stands as the third key participant in the collection of evidence. This physician should include clinical and laboratory findings and a medical assessment of the claimant's work-related capabilities. 20 C.F.R. § 404.1513.

The remaining two participants in the disability determination process are the BDD disability examiner and the BDD staff physician. They are responsible for the development and evaluation of disability claims at the initial and reconsideration levels.

The disability examiner should collect, interpret, and evaluate all the medical information. The disability examiner is a non-medical employee. The disability examiner should determine the capacities of a claimant to perform substantial gainful activities. *See* 20 C.F.R. § 404.1615(c). The disability examiner must first consider the medical evidence submitted by the treating physician, as well as specialists who have treated the client, hospitals, clinics, and the like. If the disability examiner does not have enough information, then he may require a consultative examination. 20 C.F.R. § 404.1517.

The disability examiner should consult with the staff physician for technical advice on the significance of the medical findings. The staff physician has the ultimate responsibility for RFC assessments and other medical judgments. 20 C.F.R. § 404.1546.

*Day,* 794 F.Supp. at 807–808.

## III. DISTRICT COURT CASE

Plaintiffs' challenge to the practices of the BDD involved six basic claims. Plaintiffs claimed that the BDD, in violation of the Act and accompanying regulation, had:

(1) not requested medical assessments from treating and consultative sources; (2) not requested consultative examinations from treating physicians; (3) not given proper weight to the opinions of treating physicians; (4) improperly utilized guidelines to determine claimants' RFCs; (5) improperly used a procedure whereby disability examiners determined claimants' RFCs; and (6) provided claimants with denial notices which failed to properly inform claimants of their appeal rights and did not include meaningful discussions of the medical evidence and reasons for denial.

*Day,* 794 F.Supp. at 808.

The District Court determined "that the plaintiffs should prevail," and ordered the BDD to give notice to all class members that they may reopen their applications for disability benefits. *Day,* 794 F.Supp. at 809. The District Court found four specific errors on the part of the BDD that mandated reopening class members' applications, as well as a number of "questionable" activities that it ordered must cease.

The four errors found by the District Court which required the reopening of class members' applications were: (1) the BDD did not adequately request medical assessments from treating physicians, because insufficient space was left for treating physicians to answer the question regarding a claimant's work-related abilities, *Day,* 794 F.Supp. at 810; (2) the BDD did not make "every reasonable effort" to have treating physicians perform consultative examinations, *id.* at 813; (3) the BDD's RFC guidelines violated the notice, comment, and publication requirements of the Administrative Procedure Act (APA), *id.* at 818; and (4) the BDD's denial of benefits notices failed to afford claimants a proper opportunity to present their objections, in violation of claimants' due process rights, *id.* at 820–21.

Additionally, the District Court found some of the BDD's practices "questionable," and ordered them changed. Specifically, the District Court found the BDD's use of RFC guidelines questionable, and enjoined any use of the guidelines for class members who reopen their applications, or for new claims for disability benefits. *Day,* 794 F.Supp. at 818. Also questionable, the District Court found, was the BDD's procedure of allowing disability examiners to complete RFC evaluations, which were then signed by staff physicians.

The District Court therefore ordered that medical or psychological consultants, rather than non-medical employees, were to assess RFC when required.

On appeal, appellants argue that all four of the District Court's grounds for requiring the reopening of class members' applications for disability benefits were erroneous. And even if the District Court findings were not erroneous, appellants argue, there was no justification for the remedy of allowing all class members to reopen their applications. Appellants also claim as a threshold matter that the class was improperly certified.

Respondents argue that the four findings challenged by appellants were correctly decided, and that the class was properly certified. On cross-appeal, they challenge the District Court's finding that the BDD's practice of not attempting to contact treating physicians at teaching hospitals or clinics was reasonable. Respondents urge that the BDD's mandate to "make every reasonable effort" to obtain medical information from treating physicians must be extended to claimants who receive their medical care at teaching hospitals or clinics.

## IV. APPELLANTS' PROCEDURAL CLAIM OF ERROR—CERTIFICATION OF THE CLASS

Following a magistrate judge's recommendation, the District Court certified a class consisting of:

All persons who applied for and were denied, or were terminated from, the receipt of [Title II] or [Title XVI] disability benefits since October 9, 1984, or who will be denied or terminated from the receipt of [these] benefits, by the Ohio Bureau of Disability Determination. This class excludes persons who were denied or terminated because they have returned to substantial gainful activity or who are not eligible for disability benefits for reasons not related to disability.[3]

The scope of judicial review over decisions by the Secretary to deny disability benefits is governed by 42 U.S.C. § 405(g). Under § 405(g), an individual may obtain judicial review of "any final decision of the Secretary made after a hearing to which he was a party." The "civil action" seeking review of the Secretary's final decision is to be "commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." *Id.* Appellants challenge the District Court's certification of the class, arguing that the class violates the § 405(g) requirements that judicial review is to be commenced within sixty days of the Secretary's decision, and that only "final decision[s]" are to be reviewed.

The class certified by the District Court was not well defined. The class had no closing date, and fails to take into account the distinctions between the varying grounds for relief claimed by plaintiffs. Plaintiffs concede, for instance, that the notice forms used by the BDD starting in February, 1990, are adequate, so no plaintiff could claim receipt of such a notice form as a ground for relief. The class certified by the District Court does not recognize such distinctions. Because of the limited relief we will grant, we need not more fully develop the relevant distinctions among would be class members. Instead we will analyze the certification of the class in light of the only actual error we find the BDD to have committed, the use of an inadequate Title II reconsideration denial notice prior to February, 1990.

### A. Equitable Tolling

■ The starting date of the class certified by the District Court, October 9, 1984, is almost three years prior to the filing of Mr. Day's original complaint (filed on October 2, 1987), and more than three years prior to the filing of the amended class complaint on December 4, 1987. October 9, 1984, is the date of enactment of § 9(b)(1) of the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423(d)(5)(B), which requires that the Secretary make every reasonable effort to obtain necessary medical evidence from a claimant's treating physician.

Appellants contend that the District Court erred in certifying the class with the 1984

---

**3.** As defined, the class had no closing date.

starting date, because the class includes claimants who obtained final decisions denying benefits more than sixty days prior to the filing of a complaint, in violation of 42 U.S.C. § 405(g). Respondents rely primarily on *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) to argue that the District Court in certifying the class properly invoked equitable tolling to avoid the effective sixty day statute of limitations imposed by § 405(g).

In *City of New York*, the Supreme Court affirmed its earlier decisions declaring that the sixty day limit in § 405(g) is not jurisdictional but a period of limitations. 476 U.S. at 478, 106 S.Ct. at 2029. Noting that Congress evinced a clear intention to allow tolling of the sixty day limit in some cases,[4] the Supreme Court next concluded that application of traditional equitable tolling principles to § 405(g) was "consistent with the overall congressional purpose" behind the statute, and was "nowhere eschewed by Congress." *Id.* at 480, 106 S.Ct. at 2030 (citation omitted). Quoting from the Second Circuit's opinion, the Supreme Court held:

> All of the class members who permitted their administrative or judicial remedies to expire were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States. Though they knew of denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge. Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action.

*Id.* at 480–481, 106 S.Ct. at 2030 (citation omitted).

Appellants argue that *City of New York*'s reasoning does not apply to the instant case because the BDD was not engaged in "secretive conduct." In making their argument, appellants distinguish policies which are clan-destine or secretive, and therefore would function to toll the sixty day period of limitation, from those which are merely unpublished and undisclosed, which would not function to toll the sixty day period. Appellants characterize the policies challenged in this case as unpublished but not clandestine or secretive, and assert that the sixty day period therefore should not have been tolled.

It is evident that not every practice of agencies as large as the Social Security Administration and the state BDD's could or should be reduced to published regulations. *City of New York* does not function to void the § 405(g) sixty day period of limitation as to every practice of an agency not embodied in a regulation. The policy in *City of New York* was deemed secretive and clandestine not only because it was unpublished, but also because since the policy was enforced through internal memoranda and the "returns" process through which the SSI sends cases back to the states for correction, "the affected SSD or SSDI applicant, as well as counsel, social workers and advisers for a long time were unaware of its existence." *City of New York*, 476 U.S. at 475, 106 S.Ct. at 2029.

The only practice of the BDD that we find to present a ground for reopening of claims is the Title II reconsideration denial notice used prior to February, 1990. Use of this notice form is not secretive in the manner of the challenged practice in *City of New York*. Anyone who received a denial notice knew what the notice said. It is impossible to characterize this failure on the part of the BDD as a practice of which affected claimants "as well as counsel, social workers and advisers for a long time were unaware." *City of New York*, 476 U.S. at 475, 106 S.Ct. at 2027. Because this case involves no secretive or clandestine policy, we will not invoke equitable tolling. The class therefore excludes any claimants whose applications for reconsideration were denied more than sixty days before the filing of the amended class complaint on December 4, 1987.

---

**4.** § 405(g) authorizes the Secretary to toll the sixty day limit.

## B. Exhaustion of Administrative Remedies

■ *City of New York* is also controlling on the issue of excusing exhaustion of administrative remedies. In *City of New York*, the Supreme Court identified three factors to be considered in deciding whether to waive an exhaustion requirement: (1) are the claims at issue collateral to the underlying decisions as to eligibility for entitlements; (2) would claimants be irreparably harmed were the exhaustion requirement enforced against them; and (3) would exhaustion of administrative remedies be futile. 476 U.S. at 482–86, 106 S.Ct. at 2031–33. Because we find that the only ground for reopening claims in this case is the inadequate Title II reconsideration denial notice used before February, 1990, we evaluate waiver of exhaustion only as it applies to the denial notices.

### 1.

Plaintiffs' claims are collateral to the underlying question of their eligibility for disability benefits. In *City of New York*, the Supreme Court found plaintiffs' claims collateral to their claims for benefits because "the class members neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." *Id.* at 483, 106 S.Ct. at 2032. Plaintiffs' claims are analogous in this respect to those in *City of New York.* Plaintiffs do not seek to be found eligible for benefits in this action, but rather challenge the procedure by which eligibility determinations were made by the BDD.

Appellants argue that plaintiffs' claims are not collateral because they are "inextricably intertwined" with plaintiffs' claims for benefits, relying on *Heckler v. Ringer*, 466 U.S. 602, 614, 104 S.Ct. 2013, 2021, 80 L.Ed.2d 622 (1984). *Heckler* 's reasoning is inapplicable here. The Supreme Court found the claims at issue in *Heckler* "inextricably intertwined" with plaintiffs' claims for benefits, and therefore not collateral, because plaintiffs sought an injunction compelling the Secretary to declare a certain surgical procedure reimbursable under the Medicare Act, so that after obtaining their desired relief, "only essentially ministerial details will remain be-

fore respondents [plaintiffs] would receive reimbursement." 466 U.S. at 615–16, 104 S.Ct. at 2022. In effect, the claims in *Heckler* were claims for benefits, disguised as a procedural challenge.

The instant claim is not "inextricably intertwined" with plaintiffs' claims for benefits in the manner of the claims involved in *Heckler;* plaintiffs here, like those in *City of New York,* would not automatically be entitled to receive benefits if they prevail, but only to receive "the procedure they should have been accorded in the first place." *City of New York,* 476 U.S. at 484, 106 S.Ct. at 2032. We join a number of other Circuits in finding such an action collateral to the substantive claims for benefits. *See, Schoolcraft v. Sullivan,* 971 F.2d 81, 86 (8th Cir.1992); *Marcus v. Sullivan,* 926 F.2d 604, 614 (7th Cir.1991); *State of New York v. Sullivan,* 906 F.2d 910, 918 (2d Cir.1990); *Hyatt v. Heckler,* 807 F.2d 376, 379–380 (4th Cir.1986). The claims here are therefore collateral to the question of whether individual claimants are entitled to disability benefits, and this factor weighs in favor of excusing the exhaustion requirement.

### 2.

Plaintiffs have presented a colorable claim of irreparable harm based on denial of benefits. Denial of benefits results in a failure to receive income required to purchase the necessities of life, including medication, and causes anxiety and distress which can aggravate existing conditions. The Supreme Court has instructed us to "be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have received in the first place." *City of New York,* 476 U.S. at 484, 106 S.Ct. at 2032.

The fact that plaintiffs may eventually receive full retroactive benefits does not require the conclusion that their injury is not irreparable. The Supreme Court has recognized that "suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the belated restoration of

back benefits.'" *Schweiker v. Chilicky*, 487 U.S. 412, 428, 108 S.Ct. 2460, 2470, 101 L.Ed.2d 370 (1988).[5] As plaintiffs have presented a colorable claim of irreparability, this factor also favors excusing the exhaustion requirement.

### 3.

The final factor regarding the propriety of requiring exhaustion is whether enforcing the exhaustion requirement would serve the policies underlying the requirement, or would, to the contrary, force claimants to complete a futile procedure. This factor also weighs in favor of excusing exhaustion. Enforcing the exhaustion requirement in the context of this case would not serve the policies underlying exhaustion, but would impose a logically impossible burden on claimants.

We have found that the only class members who are entitled to reopen their claims for benefits are those who detrimentally relied on the inadequate Title II reconsideration denial notices used before February, 1990. By definition, these class members filed a new application when they should have continued the appeal process. Requiring such claimants to have exhausted the appeal process would make it impossible for any plaintiff ever to obtain a remedy for an agency's use of inadequate denial notices. Because all three factors weigh in favor of excusing exhaustion, failure to exhaust administrative remedies will not bar the limited number of class members entitled to relief from reopening their claims.

## V. APPELLANTS' SUBSTANTIVE CLAIMS OF ERROR

Appellants challenge as erroneous all four of the District Court's findings in favor of plaintiffs. The four issues on which the District Court found in favor of plaintiffs were: (1) the BDD's procedures concerning medical assessments from treating physicians failed

to comport with the Social Security Act; (2) the BDD had not made "every reasonable effort" to have treating physicians perform consultative exams, as required under 42 U.S.C. § 423(d)(5)(B); (3) the BDD implemented residual functional capacity guidelines in violation of the notice, comment, and publication requirements of the Administrative Procedure Act; and (4) the BDD's denial notices failed to inform claimants of the possible *res judicata* consequences of reapplying for benefits rather than appealing the denial, in violation of claimants' due process rights.

■ In evaluating an agency's implementation of a complex administrative scheme, it is important to respect the balance struck by the agency between competing policies and concerns. Judges, who "are not part of either political branch of the Government," must not substitute their own judgments for decisions made by an agency that fall within the limits of the policymaking responsibilities delegated to the agency by Congress. *Chevron, U.S.A, v. Natural Res. Def. Council*, 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). It is against this background that we consider appellants' charges of error.

### A. BDD procedures concerning obtaining medical assessments from treating physicians.

Forty-two U.S.C. § 423(d)(5)(B) requires the BDD to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence ... necessary in order to properly make" a determination regarding disability. Among the medical evidence the BDD must obtain is a medical assessment of the claimant's ability to perform work-related activities such as standing, walking, lifting, etc. 20 C.F.R. §§ 404.1513(c), 416.913(c). Plaintiffs prevailed at trial on their claim that the BDD's procedures fail to comport with the requirements of the Act and accompanying regulations because the BDD did not

---

5. *Schweiker* does not stand for the proposition urged by appellants, that economic injury is insufficient to justify excusing a plaintiff's failure to exhaust administrative remedies. Rather, in *Schweiker* the Supreme Court found that plaintiffs were not entitled to bring a *Bivens* constitutional tort action for money damages against state and federal officials, based on its reluctance "to create a new substantive legal liability" by making a *Bivens* remedy available against administrators in their personal capacity. 487 U.S. at 426–428, 108 S.Ct. at 2469–70.

obtain proper medical assessments from treating physicians at the initial and reconsideration levels. *Day*, 794 F.Supp. at 809–10.

The BDD's usual procedure for collecting medical information about a claimant involves sending the treating physician a letter containing a standardized introduction and conclusion, and specific diagnostic questions grouped by impairment. Through 1987, the letters sent to treating physicians did not directly address the claimant's ability to perform work-related activities. After 1987, the BDD added a question directly asking the treating physician about the claimant's ability to perform work-related activity.[6] Less than an inch of space was provided for the physician's answer to this question. The District Court found that although the wording of the question in its most recent form could satisfy the requirement to obtain medical assessments from treating physicians,[7] the meager space allotted for the physician's response rendered the attempt to obtain medical assessments inadequate. The lack of space, the District Court found, encouraged cursory responses and violated the "spirit of the Act and the 1984 amendments of giving weight to the opinion of treating physicians." *Day*, 794 F.Supp. at 801.

■ Appellants argue that the District Court's finding that the space left to respond to the medical assessment question was inadequate is irrelevant in light of the Court's Order of Clarification, which contains the statement "the Defendants did indeed request a medical assessment from treating physicians." *Day*, 794 F.Supp. at 823. Appellants further argue that leaving less than one inch of space to respond to the question, if relevant, does not violate the spirit of the Act, and that finding the space inadequate is inconsistent with the District Court's reasoning concerning consultative examiners, who are not asked a question specifically addressing work-related abilities.

The District Court's Order of Clarification did not render its earlier holding about the inadequacy of the space provided to answer the question about work-related abilities irrelevant. The Order of Clarification did not add anything to the earlier Order concerning the adequacy of the BDD's attempt to obtain medical assessments from treating physicians. While the Order of Clarification, like the earlier Order, recognized that the BDD asked a question requesting a medical assessment, it did not modify the District Court's earlier holding that the question did not serve to discharge the BDD's duty to obtain medical assessments from treating physicians, because of the inadequate space provided to respond to the question.

Nevertheless, we do not find that leaving a limited amount of blank space in which to respond to a question is a sufficient ground on which to hold that the BDD failed to comply with the mandates of the Act. The Act requires the BDD to "make every reasonable effort" to obtain medical assessments from treating physicians. Asking treating physicians a question specifically addressing claimants' work-related abilities is a reasonable interpretation of the BDD's mandate. The amount of space left to respond to the question is too slender a ground on which to fault the judgment of the BDD. Physicians are capable of writing on the back of the page or attaching additional sheets to the questionnaire if necessary. The Court does not discern any principled basis on which it

---

**6.** The wording of the question has changed over the years; plaintiffs contend that the question did not even approach satisfying the Act and regulations' requirements until it was revised in 1990 to give examples of work-related activities.

**7.** The question now reads: "Based on your objective findings, if the patient is of working age, please give an assessment of the patient's ability to do work related activities, such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling and if there is a mental impairment, the ability to rea-

son, make occupational, personal or social adjustments." *Day*, 794 F.Supp. at 810.

The earlier version of the question, which was asked beginning in 1988, read: "Based on your reported objective findings, please describe your patient's ability to do work-related activities." While the later version of the question is certainly an improvement, the Court does not find that the 1988 version of the question fails to comport with the requirements of the Act and accompanying regulations, as it still represents a reasonable effort to obtain the required evaluation of work-related abilities.

could determine the specific minimum amount of space required by the general mandate to "make every reasonable effort" to obtain necessary information, and therefore will not interfere with the judgment of the BDD on this issue.

■ Prior to 1988, though, the BDD did not ask any question directly addressing the claimant's ability to perform work-related activities in the letters it sent to treating physicians. The failure to ask any question directly addressing work-related activities violated the BDD's mandate to "make every reasonable effort" to obtain medical assessments from treating physicians. While appellants point out that the specific impairment-based questions asked of treating physicians frequently require descriptions of specific work-related abilities, not all of the specific impairment-based questions require such descriptions. Furthermore, specific impairment-based questions, by their design, address only specific impairments, and therefore even when they do require description of work-related abilities they do not inform the BDD of limits on work-related activities that derive from a combination of impairments.

We therefore find that the District Court was correct in finding that the BDD's medical assessment procedure was inadequate prior to 1988, but the District Court erred in finding the procedure inadequate after the addition of the specific work-related activities question to the letters sent to treating physicians. Unfortunately, the only available remedy for this error on the part of the BDD, reopening the claims of affected claimants, will not remedy the error. While the opinion of the treating physician as to work-related abilities should have been sought when claimants' applications for benefits were evaluated, asking treating physicians today, in 1994, to re-examine patient files in order to form

retrospective opinions of claimants' work-related abilities will yield only opinions less reliable than those formed at the time of the claimants' applications. The BDD's failure prior to 1988 specifically to ask treating physicians to comment on a claimant's ability to perform work-related activities, though it violated SSA regulations, is not a ground for the reopening of class member's claims.

**B. Whether the BDD made a reasonable effort to have treating physicians perform consultative examinations.**

■ It is undisputed that "the vast majority of ... consultative examinations" are performed by the BDD's panel of examiners rather than by treating physicians.[8] *Day,* 794 F.Supp. at 812. The District Court found that this failure to obtain consultative examinations from treating physicians violated the BDD's mandate to make "every reasonable effort" to obtain necessary medical information from treating physicians under 42 U.S.C. § 423(d)(5)(B) and POMS DI § 22505.035 ("use the attending physician where possible").[9] *Day,* 794 F.Supp. at 812–13. Appellants argue that they did make every reasonable effort to obtain consultative examinations from treating physicians. Few consultative examinations were performed by treating physicians despite their efforts, appellants argue, due to practical difficulties encountered in attempting to use treating physicians.

Appellants' most important justification for the low number of consultative examinations performed by treating physicians is a lack of interest on the part of treating physicians in performing the examinations. The BDD used a survey of physicians and psychologists in the state to determine the *level interest* in performing consultative examinations. While

---

8. "In the 1988 and 1989 fiscal years, the BDD obtained over 66,000 consultative examinations. Only 505 were scheduled with treating physicians." *Day,* 794 F.Supp. at 813.

9. POMS DI § 22505.035 states:
   When evidence of record is not readily available or will not suffice and purchase of further evidence is indicated, use the attending physician where possible. Discuss it with the attending physician to see if he or she is willing

to perform such an examination. Then inform the attending physician in writing of the specific examination and/or tests which are needed. When in the DDS experience it is known that the attending physician is not a productive source, use another source.
   The Program Operating Manual System (POMS) sets out procedures for day-to-day operation of all programs administered by the Social Security Administration.

the SSA sent a letter to the BDD in November, 1986, questioning the use of surveys to determine interest in performing consultative examinations, in December, 1986, the SSA approved the BDD's use of its list of doctors interested in performing the examinations, and continues to approve of the use of surveys to identify physicians interested in performing consultative examinations.[10]

■ Because the use of a survey to determine what treating physicians are willing to perform consultative examinations is explicitly approved by the Program Operating Systems Manual promulgated by the Social Security Administration, POMS DI § 22510.-010, we find that the BDD's use of such a list does adequately satisfy the BDD's obligation to obtain consultative examinations from treating physicians when possible. Before 1987, though, the BDD never requested consultative examinations from claimants' treating physicians. The failure ever to obtain consultative examinations from treating physicians violated the BDD's obligation under the Act and regulations to "make every reasonable effort" to obtain necessary medical information from treating physicians.

We find that the District Court was correct in holding that the BDD had failed to carry out its obligation to obtain consultative examinations from treating physicians prior to 1987, but erred in finding improper the BDD's use of its list of physicians interested in performing consultative examinations starting in 1987. Like the BDD's failure before 1988 to ask treating physicians a specific question concerning claimant's work-related abilities, the timing of this suit precludes remedying the BDD's inadequate procedures with regard to obtaining consultative

examinations prior to 1987. Reopening claims in order to allow claimants to obtain consultative examinations from their treating physicians now, more than seven years later, would not yield any useful information bearing on a claimant's condition prior to 1987.[11] The BDD's failure prior to 1987 ever to obtain consultative examinations from treating physicians was an error, but is not a ground for reopening class members' claims.

**C. Notice and comment regarding the residual functional capacity guidelines.**

■ In 1983, the BDD enacted "RFC [Residual Functional Capacity] guidelines," setting forth criteria to apply in determining whether claimants' impairments were to be deemed severe. *Day,* 794 F.Supp. at 801. If the claimant's impairment was deemed severe, the RFC guidelines played a role in determining the claimant's RFC. The District Court found that the BDD's use of the unpublished RFC guidelines was "questionable," and ordered that the guidelines not be used in evaluating new claims or old claims which are reopened following this case. The only ground on which the District Court found that use of the RFC guidelines provided a basis for reopening claims of class members, though, was that the unpublished guidelines violated the notice, comment, and publication requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 552, 553.

The District Court noted, at the beginning of its discussion of whether the RFC guidelines violated the APA, that "the APA requires that *federal* agencies publish 'substantive' agency rules in the Federal Register in order to allow the public to comment on the

---

10. POMS DI § 22510.010.B.1.a states that "[t]he treating source's willingness to perform a CE [consultative examination] should be determined by a general survey of physicians in the State once every 3 years, or an inquiry of the MER [Medical Evidence of Record] letter, or a telephone call to the treating source at the time it is decided that a CE is needed, or by any combination of these techniques."
  Plaintiffs have not challenged the validity of POMS DI § 22510.010.B.1.

11. Even if claims were reopened, a limited number of claimants would be affected. First, only

those claimants who received consultative examinations from doctors other than their treating source would qualify for reopening. If a claimant qualified for reopening, he or she would be entitled to receive the adequate procedure employed today, involving checking to see if the claimant's treating source appeared on the BDD's list of consultative examination doctors. Only if the claimant's treating source appeared on the list would he or she be entitled to submit a new consultative examination performed by her treating source.

proposed regulations." *Day,* 794 F.Supp. at 818 (emphasis added) (citations omitted). While the District Court went on to discuss whether the RFC guidelines were substantive or merely interpretive, it did not explain how the BDD, an Ohio agency, could be subject to the requirements of the APA, which pertain to federal agencies.[12]

Plaintiffs, in a footnote to their brief, state that the BDD "acts under contract as SSA's agent," and is completely funded by the SSA. No evidence or authority points to a contractual relationship between the BDD and SSA, or suggests that such a contract would, if established, subject the BDD to the requirements of the APA. In a footnote of its own, the District Court noted that "ultimately ... the Secretaries of HHS and the BDD are jointly responsible for the actions and decisions of the BDD." *Day,* 794 F.Supp. at 806, n. 3. Again, no evidence or authority is cited in support of this proposition, nor is it clear how such joint responsibility implicates the application of the APA to the Ohio BDD. This is not a case in which the federal agency adopts regulations proposed by states, which might require the federal agency to comply with the APA's notice and comment provisions.[13]

Because the APA applies only to federal agencies, we find that the District Court erred in holding that the BDD should have complied with the APA's notice, comment, and publication requirements in implementing the RFC guidelines.[14] Failure to comply with the APA's requirements is not, in this case, a ground for requiring the reopening of class members' disability applications. Our holding on this issue does not address the other issues regarding RFC guidelines which led the District Court to find the BDD's actions "questionable," and does not alter the District Court's orders regarding the RFC guidelines based on grounds other than failure to comply with the APA.

## D. The BDD's denial notices.

■ Plaintiffs contend that the BDD's denial notices violated both their procedural due process rights and their rights under the Social Security Act. The District Court found that the denial notices violated Constitutional procedural due process rights, and did not address the issue of rights under the Act. *Day,* 794 F.Supp. at 820. Appellants argue that the District Court's holding on this issue was in error.

The District Court properly summarized the due process concerns implicated in the BDD's denial notices:

> A claim of entitlement to social security benefits triggers due process protections. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process requires that the BDD must give claimants "notice reasonably calculated, under all the circumstances.... [that] apprise[s] the interested parties of the pendency of the action and afford[s] them an opportunity to present their objections." *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 13, 14, 98 S.Ct. 1554, 1562-63, 56 L.Ed.2d 30 (1978) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)).

*Day,* 794 F.Supp. at 820. The District Court found that the BDD's denial notices failed to meet the *Memphis Light* standard because the notices failed to inform a claimant of the *res judicata* consequences of filing a new application instead of appealing the denial decision. *Day,* 794 F.Supp. at 821.

■ Courts must be mindful of the deference due to the agency's decisions when eval-

---

12. For the purposes of the APA, " 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain listed exceptions. 5 U.S.C. § 551(1).

13. *American Lung Association of New Jersey v. Kean,* 871 F.2d 319, 322 (3d Cir.1989) explains that under the Clean Air Act, for example, implementation plans "are promulgated by state agencies after notice and comment and must be ap-

proved by the EPA after it conducts its own notice and comment proceedings." The notice and comment requirement applying to state agencies in that context derives from the Clean Air Act itself, 42 U.S.C. § 7410, not from the APA.

14. The parties did not brief, and the Court does not address, the issue of whether the Ohio APA might have applied to the RFC guidelines.

uating the adequacy of process provided. The Supreme Court tells us that

> [i]n assessing·what process is due, ... substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals.

*Mathews,* 424 U.S. at 349, 96 S.Ct. at 909 (citation omitted). The Supreme Court also emphasizes "the importance of not imposing upon the States or the Federal Government ... any procedural requirements beyond those demanded by rudimentary due process." *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970).

In *Gonzalez v. Sullivan,* 914 F.2d 1197, 1203 (9th Cir.1990), the Ninth Circuit found the 1983 version of the Secretary's denial notice to violate a claimant's fifth amendment right to procedural due process, noting that district courts considering the issue had uniformly found the notice inadequate. *See Christopher v. Secretary of Health and Human Serv.,* 702 F.Supp. 41, 43 (N.D.N.Y. 1989); *Butland v. Bowen,* 673 F.Supp. 638, 640–42 (D.Mass.1987); *Dealy v. Heckler,* 616 F.Supp. 880, 884–887 (W.D.Mo.1984). In 1984, the Secretary added language to the denial notices underlining the importance of bringing an appeal within sixty days.[15] The denial notices were again revised in 1990.[16] Plaintiffs concede that the language added to the 1990 versions of the notices cured the deficiencies they urge us to find in the earlier versions. Because plaintiffs concede that the notices used starting in February, 1990, are adequate, their challenge is only to the notices in use from October 9, 1984 until February, 1990.

Plaintiffs argue that even as amended in 1984, the denial notices and accompanying explanatory leaflets failed to make clear the crucial distinction between appealing a determination and reapplying for benefits. A claimant who reapplied rather than appealed faced the application of *res judicata* as a bar to the second claim, and might encounter limitations on the payment of retroactive benefits, which would be calculated from the date of the new application rather than the initial, unappealed one. The Title II denial notices at issue, however, state:

> If you do not request a hearing of your case within the prescribed time period, you still have the right to file another application at any time.

A claimant thus may have been misled, plaintiffs argue, into believing that failing timely to appeal the initial determination was not serious, because a new application could be filed at any time.

The language to which plaintiffs object appeared only in the Title II denial notices, not the Title XVI notices. Furthermore, in the Title II initial denial notices, the complained of sentence was immediately followed by the admonition that "[a] new application is not the same as an appeal of this determination." This notice did distinguish between reapplying and appealing; a claimant could not reasonably read the notice and think that filing a new application had the same effect as appealing the initial determination. Only the Title II reconsideration denial notice contained the language of which plaintiffs complain without the warning that filing a new application was not equivalent to appealing the negative decision. This notice, appellants admit, is essentially the same as that rejected by the Ninth Circuit in *Gonzalez.* We join the Ninth Circuit in finding this

---

15. Specifically, appellants direct our attention to the following language, appearing under a section entitled, in bold type, **"YOUR RIGHT TO APPEAL"**:

> IF YOU WANT A RECONSIDERATION, YOU MUST ASK FOR IT WITHIN 60 DAYS FROM THE DATE YOU RECEIVE THIS NOTICE. IF YOU WAIT MORE THAN 60 DAYS, YOU MUST GIVE US A GOOD REASON FOR THE DELAY.

16. A section under the heading **"NEW APPLICATION"** states:

> You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

**1066**

particular notice form, which is no longer used, inadequate.

Although the Title II reconsideration denial notices used before February, 1990, failed to satisfy the requirements of due process, the only claimants who could have been injured by the inadequacy are those who detrimentally relied on the inadequate denial notice. A claimant relied to his or her detriment on the inadequate notice if he or she was denied benefits at the reconsideration level then received the inadequate notice, and thereafter filed a new application rather than continuing the appeal process, and then were presented by the Secretary with a claim of *res judicata* or received less in retroactive benefits than he or she would have had they successfully appealed initially.[17] The limited number of class members who fit this description are entitled to reopen their applications.

## VI. RESPONDENT/CROSS-APPELLANT'S CLAIM OF ERROR

■ Respondents assert that the District Court erred in upholding the BDD's practice of not requesting medical reports from treating physicians at teaching hospitals and clinics. Not contacting treating physicians at teaching hospitals and clinics, as a matter of course, respondents argue, violated the BDD's duty under 42 U.S.C. § 423(d)(5)(B) to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence" necessary to making disability determinations.

17. The application of a *res judicata* bar or reduction of benefits by the Secretary in these circumstances entitles class members to reopen their applications. Claimants who appealed the *res judicata* decision to a District Court, though, have had the benefit of judicial review, and are not entitled to a second bite at the apple here. Such claimants must abide by the decision of the court in their own appeal, and are not entitled under this decision to reopen their applications.

18. 20 C.F.R. § 404.1502 defines a "treating source" as a physician or psychologist "who has or has had an ongoing relationship" with the claimant. A claimant has an ongoing relationship with the physician or psychologist if the physician or psychologist has seen the claimant

The District Court based its conclusion that the BDD's practice of obtaining medical records directly from teaching hospitals and clinics, rather than contacting treating physicians at those institutions, constituted a "reasonable effort" on the assumption that at many such institutions "the patient does not have a treating physician that she sees on a regular basis, [but] ... sees whichever physician is on duty at that time," so that "sustained relationship between doctor and claimant is not as likely" as in other contexts. *Day v. Sullivan*, 794 F.Supp. 801, 810–811 (S.D.Ohio 1991). The District Court's conclusion was based on the Supplemental Declaration of Richard Leyland (Leyland), Medical Administrator for the BDD.

Respondents dispute the conclusion of the District Court, claiming that many patients at teaching hospitals and clinics did have treating physicians whom they saw on a regular basis.[18] In support of their contention, respondents offer the experience of name plaintiff Clide, who had ongoing treatment with the same physician for three years at the University of Cincinnati Hospital Pulmonary Clinic, and named plaintiff Kinsler, who was treated by the same physician at the University of Cincinnati Hospital Renal Clinic for more than eighteen months and by the same physician at the Central Psychiatric Hospital for six months. Each of these doctors submitted medical reports when requested at the ALJ level of review. Respondents also report that treating physician reports were obtained from doctors at Cleveland's equivalent of the University of Cincinnati Hospital, when requested by attorneys representing claimants at the ALJ level.

"with a frequency consistent with accepted medical practice for the type of treatment and evaluation required by [the claimant's] medical condition(s)."

Prior the enactment of 20 C.F.R. § 404.1502, this Court defined treating physicians as "physicians who have seen plaintiff several times over a period of months." *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir.1983). *Accord Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir.1988) (defining treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual.")

The District Court did not adequately address plaintiffs' arguments with regard to whether patients at clinics and teaching hospitals, in practice, have treating physicians. Nevertheless, we are satisfied that no purpose would be served by remanding for further findings on this issue, as the record in its current state contains adequate grounds for a decision.

The BDD is required to "make every reasonable effort" to obtain necessary medical evidence from treating physicians. Within this broad mandate, the BDD had discretion to fulfill its mission in the manner it considered most effective. As Leyland's Declaration and Supplemental Declaration detail, the BDD made efforts to obtain information directly from doctors at teaching hospitals and clinics, but found that the institutions refused to cooperate with such requests. Requests made to doctors directly, rather than to records departments, were "eventually answered by a medical records department, if at all." The BDD found that it received the same information—medical records, rather than medical assessments from treating physicians—more quickly when it made inquiries directly to records departments, rather than contacting individual physicians. This determination was grounded in the experience and expertise of the agency. Having attempted to obtain information directly from doctors only to receive delayed records from medical departments, the BDD instituted a policy of directly contacting medical records departments at teaching hospitals and clinics. While this approach did not allow treating physicians to offer assessments of a claimant's ability to perform work-related activities, the BDD was not receiving such assessments even when it did send letters directly to doctors at teaching hospitals and clinics. Making "every reasonable effort" does not require the BDD to pursue an approach which proved to be ineffective and inefficient.

The individual examples to the contrary offered by respondents did not create a material issue of fact. Respondents have only shown that in a few isolated instances physicians at treating hospitals and clinics responded to requests from attorneys for medical assessments. They did not show that their examples are typical, or that the BDD would enjoy the same success on a wholesale basis that the lawyers did in a limited number of instances. The BDD's own experience is the reverse, and we defer to its decision. The District Court did not err in upholding the BDD's practice of not requesting medical reports from treating physicians at teaching hospitals and clinics.

## VII. CONCLUSION

For the reasons stated, the District Court is AFFIRMED in part and REVERSED in part. Specifically, we REVERSE the District Court's invocation of equitable tolling to allow the class to include claimants who obtained final decisions denying benefits more than sixty days prior to the filing of the amended class complaint of December 4, 1987, and REVERSE the decision to allow reopening of claims for all class members, except for those who detrimentally relied on the inadequate Title II reconsideration denial notices. We AFFIRM the reopening of claims for those class members who detrimentally relied on the inadequate Title II reconsideration denial notices, and the remainder of the District Court's Order. The case is REMANDED to the District Court to determine the procedure for allowing the reopening of the claims for benefits of those class members who are entitled to relief.[19]

BATCHELDER, concurring in part and dissenting in part.

Although I concur in much of the majority's opinion, I must dissent from those portions which result in the reopening of any claims. For the reasons which follow, I would hold that no class can be certified and the entire case should have been remanded to the district court to be dismissed.

The majority limits the potential class members to those claimants who detrimen-

---

**19.** In order to minimize confusion, the Court emphasizes that the class entitled to relief consists of those claimants who detrimentally relied on the inadequate Title II reconsideration no-

tices, as described at pp. 1065–66 above, and faced a *res judicata* bar to any new application, which resulted in the issuance of a total or partial denial of benefits on or after October 5, 1987.

tally relied on the inadequate Title II reconsideration denial notices used before February 1990, by filing new applications when they should have continued the administrative appeals process. Citing *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), the majority holds that since the only practice of the BDD which constitutes grounds for reopening claims is the inadequate Title II reconsideration notice, and since the use of this notice form was not clandestine or secretive, these claimants may not invoke the doctrine of equitable tolling to extend the 60–day time limitation for those appeals. Therefore, the majority holds that the class excludes any claimants whose applications for reconsideration were denied more than sixty days before the filing of the amended complaint in this class action on December 4, 1987.

However, the majority goes on to hold, again citing *City of New York,* that the failure of these class members to exhaust their administrative appeals must be excused because the claims raised in this lawsuit are collateral to the actual claims for benefits, the claimants have made a colorable claim that they would suffer irreparable harm if forced to exhaust, and requiring these claimants to exhaust the appeals process would be futile because to do so "would make it impossible for any plaintiff ever to obtain a remedy for an agency's use of inadequate denial notices." Maj. op. at 1060.

I do not believe that *City of New York* supports the reasoning of the majority with regard to the exhaustion requirement. In *City of New York,* the Court held that the 60–day limitation on seeking judicial review of a final decision of the Secretary was not jurisdictional and could therefore be waived. Because the Secretary in that case was using an internal and clandestine policy that rendered the denials of benefits subject to court challenge and could not have been known to the claimants, the Court held that the time for seeking judicial review of the final decisions denying benefits should be tolled. 476 U.S. at 480–81, 106 S.Ct. at 2030–31. The Court further held that for the same reason, claimants who had failed to obtain a final

decision from the Secretary [1] and whose time to do so had expired, were excused from the requirement to exhaust their administrative appeals. *Id.* The Court then turned to those claimants who, at the time the suit was filed, may still have had time to exhaust their administrative remedies. Looking first to *Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976), the Court noted that the two factors which had caused it to waive the exhaustion requirement in that case were also present in *City of New York:* the claims in the lawsuit were collateral to the claims for benefits that class members had presented administratively, and the claimants would suffer irreparable injury were the exhaustion requirement now enforced against them. But the Court went on to discuss the purposes of exhaustion:

> The ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the *Eldridge* factors, but should also be guided by the policies underlying the exhaustion requirement. The purposes of exhaustion would not be served by requiring these class members to exhaust administrative remedies. This case is materially distinguishable from one in which a claimant sues in district court alleging mere deviation from the applicable regulations in his particular administrative proceeding ... Thus, our holding today does not suggest that exhaustion is to be excused whenever a claimant alleges an irregularity in the agency proceedings.
>
> These claimants stand on a different footing from one arguing merely that an agency incorrectly applied its regulation. Rather, the District Court found a system-wide, unrevealed policy that was inconsistent in critically important ways with established regulations.

*City of New York,* 476 U.S. at 484, 106 S.Ct. at 2032.

Clearly, the Court did not base the waiver of exhaustion on the *Eldridge* factors alone. Rather, it premised the entire analysis on the fact that the policy of the Secretary that had resulted in the denials of benefits to all of the

---

**1.** Judicial review is available only from a final

decision of the Secretary. 42 U.S.C. § 405(g).

claimants was secretive, clandestine and illegal, and could not have been challenged by the claimants in the course of the administrative process because they could not have known about it. As the Court pointed out, "[u]nder these unique circumstances, there was nothing to be gained from permitting the compilation of a detailed factual record, or from agency expertise." *City of New York,* 476 U.S. at 485, 106 S.Ct. at 2033.

The claimants before us cannot be said to be in a situation similar to that of the claimants in *City of New York.* We hold in this case that "anyone who received a denial notice knew what the notice said," that the use of the inadequate notice therefore cannot be characterized as "a practice of which affected claimants 'as well as counsel, social workers and advisers for a long time were unaware,'" Maj. op. at 1059, quoting *City of New York,* and that this case involves no secretive or clandestine policy. Rather, the inadequate notice is much more closely akin to an incorrect application of a regulation which could have been challenged in the course of the administrative process.

For these reasons, and because there are no other "unique circumstances" that would justify waiver of the exhaustion requirement in this case, I would hold that none of the claimants in the case before us is entitled to be excused from the requirement of exhaustion of administrative appeals. Accordingly, I would hold that this Court lacks jurisdiction to hear this case.

Even if the exhaustion requirement were waived for these claimants, however, I would hold that there is no class which can be certified because the claims of those claimants who are included in the class by the majority opinion are barred by *res judicata.* The majority finds that the notice accompanying Title II denials of reconsideration prior to 1990 was inadequate and thus violated the procedural due process rights of those whose claims were denied on reconsideration. The majority goes on to hold that those individuals who, no earlier than sixty days prior to the filing of the amended complaint in this action, were "denied benefits at the reconsideration level then received the inadequate notice, and thereafter filed a new application

rather than continuing the appeal process, and then were presented by the Secretary with a claim of *res judicata* or received less in retroactive benefits than he or she would have had they successfully appealed," are entitled to reopen their claims. Maj. op. at 1065–66. In a footnote, the majority notes that such a claimant who pursued in the courts an appeal of the *res judicata* bar would not be entitled to reopen his claim, having already had the benefit of judicial review. Maj. op. at 1066 n. 17. I cannot agree with the majority's reasoning.

The majority relies on *Gonzalez v. Sullivan,* 914 F.2d 1197 (9th Cir.1990), in finding that the notice accompanying the denials on reconsideration prior to 1990 was inadequate to explain properly the appeal rights of the claimant. I have no quarrel with the conclusion that the notice was inadequate. However, *Gonzalez* was a case in which the claimant, upon denial of his claim and receipt of a notice substantially identical to the one at issue here, filed a new claim and, when faced with the *res judicata* bar, appealed that decision. The Ninth Circuit held that the notice was inadequate, that the claimant had a property right in the benefits under the Social Security Act, and that the inadequate notice was a violation of the claimant's procedural due process rights because it misled him into believing that the filing of a new claim was a substitute for filing an appeal of the denial of his first claim. Therefore, the court ruled that it had jurisdiction to review the refusal of the Secretary to reopen the first claim because of the *res judicata* bar, and that the application of the bar was error.

Unlike *Gonzalez,* the case before us is not on appeal from an adverse decision based on *res judicata;* rather it is a class action seeking, *inter alia,* a judgment permitting the members of the class to attack collaterally denials of claims. And while the notice in those cases may have been inadequate, I do not believe that a collateral attack on the decision is a permissible remedy.

With the decision in this case, this Circuit holds that the notice which accompanied denials of claims on reconsideration during the relevant time period failed to satisfy the requirements of procedural due process. For

purposes of this litigation, the claimants who received this inadequate notice fall into two groups: 1) claimants who neither appealed the denial nor filed a new claim, and 2) claimants who did not appeal the denial but filed new claims that were then denied on the basis of *res judicata*. This second group includes two sub-groups: a) claimants who did not appeal the *res judicata* decision, and b) claimants who did. As to each of these groups, the inquiry must be what process was due them and whether they received it.

Group One, who are not included by the majority in the class entitled to relief, have not yet confronted the *res judicata* bar. Nothing prevents them from filing new applications, and when they do, the law of this Circuit will be that, because the notice which they received when their initial claims were denied on reconsideration was inadequate, the *res judicata* bar will not apply.

All of the members of Group Two confronted the *res judicata* bar when their new claims, to the extent they included the substance of the first claims, were denied as being barred. Each of these claimants could have raised a constitutional challenge based on the inadequacy of the notice and appealed the *res judicata* decision at that point in the proceedings. *See Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). Those claimants who did not appeal were not precluded from doing so; they chose not to pursue an appeal. A decision which is not appealed is just as final and binding as a decision which is affirmed on appeal. *See Carver v. Secretary*, 869 F.2d 289 (6th Cir.1989).

It is important to keep clearly in mind that the *res judicata* decisions at issue here are the decisions of the Secretary in the proceedings on the *second* claims according preclusive effect to the decisions in the proceedings on the first claims. The plaintiffs here maintain that there is a procedural due process violation relative to their *first* claims, namely, that the notice which accompanied the denials on reconsideration did not adequately advise the claimants that those denials would become preclusive unless appealed. There is no claim made that these plaintiffs were in any way prejudiced or denied any procedural

due process by the notice which they received when their *second* claims were denied on grounds of *res judicata*, and in fact, we have specifically held that the only notice which was inadequate was the one which accompanied the Title II denials on reconsideration. Nothing precluded these claimants from raising the inadequacy of the notice and proceeding through the administrative appeals process on the denials of their *second* claims and obtaining final decisions, which, because of the constitutional challenge, would have been reviewable by the district court. *Califano*, 430 U.S. at 109, 97 S.Ct. at 986.

What process was due but denied to these claimants who did not appeal the denial of the *second* claim? None. They were entitled to be notified of their right to appeal. They received that notice. They chose not to appeal. The essence of what the plaintiffs seek in the case before us today, is a judgment from this Court that inadequate notice provided in the administrative appeals process on one claim excuses the failure to proceed pursuant to adequate notice in the appeals process on a subsequent claim.

Similarly, those claimants who, upon receiving the notice that their second claims had been denied on *res judicata* grounds, exhausted their administrative appeals and sought and obtained judicial review of those denials have also received all of the process that they were due.

The majority holds, and I agree, that those latter claimants, who sought and obtained judicial review of the denials of their second claims are barred from seeking review in this action. Having "had the benefit of judicial review, [they] are not entitled to a second bite at the apple" and must abide by the bad result which the court, in their separate appeals, has decreed. Maj. op. at 1066 n. 17. Certainly, this is a correct statement of the law.

A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause [of action].' We have observed that '[the] indulgence of a contrary view would result in creating elements of uncertainty.

and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of *res judicata* to avert.' [citations omitted.]

*Federated Department Stores Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981).

I would further hold, however, that those claimants who failed to pursue through the administrative process the denials of their second claims are also barred from seeking judicial review through this action, first because, as set out above, I would find that their failure to exhaust their administrative appeals cannot be excused, and secondly because, once these denials became final by virtue of the last administrative action that was not appealed, the fact that they may have been based on an erroneous view of the law does not open them to collateral attack. *Id.*